**In re The LEONARD JED COMPANY, Debtor.**

**Bankruptcy No. 84–BX–1813.**

United States Bankruptcy Court, D. Maryland.

Aug. 31, 1990.

Harvey M. Lebowitz, Jay A. Shulman, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for the Creditors' Committee.

David S. Musgrave, formerly of Semmes, Bowen & Semmes, now with Piper & Marbury, Baltimore, Md., for debtor.

## MEMORANDUM OPINION GRANTING MOTION FOR RECONSIDERATION

JAMES F. SCHNEIDER, Bankruptcy Judge.

In an earlier opinion, this Court sustained the debtor's objection to interim fees claimed by creditors' committee counsel on the grounds that (1) the case was not economically staffed; (2) counsel claimed fees for services which did not benefit the estate; (3) time records did not adequately describe the nature of many services rendered; (4) creditors' committee counsel was not entitled to a premium for increasing by 5% the distribution to unsecured creditors under a confirmed plan above the amount which the debtor originally proposed to pay; and (5) many of the charges for which reimbursement was sought were in the nature of noncompensable overhead expenses. The Court approved a fee in the amount of $34,440.96, reduced from the claimed amount of $62,999.50, and denied reimbursement of expenses for meals, secretarial overtime, postage, telephone calls and messenger services. *In re Leonard Jed Co.*, 103 B.R. 706 (Bankr.D.Md.1989).

Frank, Bernstein, Conaway & Goldman ("Frank, Bernstein"), creditors' committee counsel, filed a motion for reconsideration of the reduction of its fee, together with reconstituted time records and requested a hearing on the motion, at which time the Court entertained the presentation of testimony and documentary evidence. The U.S.

Trustee and the Bankruptcy Bar Association of the District of Maryland filed briefs as *amici curiae*. The motion for reconsideration will be granted for the following reasons.

First and foremost, many concerns raised by the earlier opinion regarding "lumping" of services and the otherwise insufficient description of services contained in the time records have been addressed by Frank, Bernstein in its reconstituted "Master Summary."

Second, the earlier opinion was overbroad in a number of its pronouncements. The instant opinion will limit its application in some respects to the particular facts of the pending case.

Third, counsel has objected to the line-by-line examination of the time records indulged in by the earlier opinion. The instant opinion holds that an in-depth examination of time records may be necessary whenever the fee application fails to sufficiently set forth the nature of work performed and the dates services were rendered or when the amount requested in a fee application appears to be unjustifiably large under the circumstances, but that *detailed time records must always be submitted in conjunction with an application for compensation.*

Fourth, the Court should not have denied compensation to creditors' committee counsel for services rendered in the nature of reviewing reports and pleadings submitted by the debtor and others.

Fifth, the Court should not have denied compensation for litigation undertaken by counsel for the creditors' committee against the debtor in good faith and within the discretion of counsel.

Finally, the Court should not have denied counsel's request for reimbursement of the cost of messenger services. It is clear that messenger services in both bankruptcy and nonbankruptcy cases in this district are routinely charged to the client, and therefore do not constitute overhead.

Counsel is entitled to be *reasonably* compensated for rendering services which are *actual and necessary* and to be reimbursed for expenses which are *actual and necessary*. It is the function of the Court to decide how much compensation is reasonable and those services and expenses which were actual and necessary.

## SPECIFIC POINTS WHICH THE COURT HAS RECONSIDERED

■ 1. Non-productive document review. In its earlier opinion, this Court generally disallowed all compensation for what it characterized as "non-productive document review." This category was described as the "reading of documents prepared by others, including motions and notices for approval of compromises of disputed claims prepared by debtor's counsel; other motions prepared by other counsel; the debtor's daily and monthly financial reports; and review of files." 103 B.R. at 714. A review of the time records contained in the Appendix to the opinion indicates that the amount disallowed for services performed in this category totalled $5,812.50. The Court allowed compensation for the review of documents only when such review led to the filing of a response by creditors' committee counsel.

Frank, Bernstein and the Bar Association both took issue with this ruling, contending that the review of notices, financial information and other documents prepared by others is an important responsibility of creditors' committee counsel. "To abdicate responsibility, or to be required to always prepare a responsive pleading in order to be allowed compensation for counsel's review and monitoring activities, would be a very undesirable result." Bar Association Brief, p. 9. "[T]he overriding principle should be the reasonableness of the compensation requested in light of the services performed and the results achieved." *Id.*

This persuasive argument has convinced the Court that it should not have denied all compensation to counsel for reviewing documents prepared by others. While it might appear that the review of financial information and reports of the debtor's business activity is the function of the committee and not of its counsel, the application to employ creditors' committee counsel [P. 17] filed on January 2, 1985 indicates that one

of counsel's functions is to "assist the Committee in its investigation of the acts, assets, liabilities and financial condition of the Debtor, the operation of the Debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case for the formulation of a plan[.]" Application, Paragraph 5(b). Additionally, in order for counsel to "perform all other legal services that may be required in the interest of the creditors," *Id.*, Paragraph 5(e), the review of pleadings and other legal documents is not only within the scope of counsel's employment but is also clearly necessary for the fulfillment of counsel's obligations to its client.

Therefore, the Court will amend its earlier opinion and allow additional compensation to creditors' committee counsel for review of documents.

■ 2. Overhead vs. "out of pocket" expenses. Secretarial overtime and meals expenses are costs of doing business for which the bankruptcy estate should not be charged, *in the absence of some compelling reason.* For example, if an emergency required work to be performed after normal business hours, the reimbursement of secretarial overtime might be justified. However, in the ordinary course of events, what reason is there to charge a client merely because routine services were rendered after normal business hours? In the nonbankruptcy setting, the additional charges would probably be written off in the exercise of billing judgment and because the services conferred no special benefit to the client. In the present case, counsel has not shown any justifiable reason for reimbursement of expenses for secretarial overtime and meals and accordingly reimbursement has been denied.

■ Long-distance telephone calls, special postage charges for so-called "heavy mailing" of notices and messenger services are reimbursable expenses. The burden is on the applicant to show the reimbursable nature of its expenses. The Court will not allow reimbursement for normal postage and local telephone charges *in the absence of some compelling reason.*

■ 3. Some services not shown to be beneficial to the estate. The Court retracts its criticism of counsel contained in Paragraph 7(c) regarding the noncompensability of litigation undertaken against the debtor. In retrospect, it is clear to the Court that it should not have "second-guessed" the strategy of counsel in representing the client. Whatever valid criticism there may be that counsel engaged in "overkill" can be dealt with by determining whether the litigation charges were unreasonably large and should therefore be reduced. It was error to deny such charges *in toto.*

The debtor and the creditors' committee were at odds throughout this case, partly because of the personalities of the parties and their lawyers. Conflict between factions representing opposing interests is unavoidable to some extent in most bankruptcy cases, and may sometimes be desirable. It was not particularly desirable in this case because the cost of the conflict threatened to consume all of the assets of the estate. At a critical point this Court intervened to try to bring about a compromise. This Court is not so naive as to believe that it was solely responsible for that settlement of differences which eventually led to confirmation of the plan. The nature of the process is often a mixture of bluff and bluster, the taking of extreme positions and the use of leverage by one side against another. The earlier opinion in this case may only have been a vain attempt to elevate the process. It was not intended as a sermon on the obvious virtues of compromise. Nevertheless, a settlement of the controversy over the fees sought by committee counsel would have been better for all concerned, because the Court probably would not have examined counsel's time records as closely as it did in the absence of an objection. There had obviously been attempts to reach an agreement without the necessity of involving the Court in a hearing, but without success. The result was the first hearing in March, 1989, culminating in the opinion of this Court dated July 7, 1989.

Frank, Bernstein has tenaciously represented the creditors' committee in this case. Presumably, the litigation it brought

against the debtor was undertaken at the client's request. Having found no bad faith on the part of either counsel or the committee in bringing such litigation, the Court will amend its opinion and will award reasonable additional compensation to the law firm.

BILLING JUDGMENT

Nevertheless, the complete absence of any indication that billing judgment occurred in this case remains the most glaring defect in the fee application. The omission of any conscious effort to write off any time charges was acknowledged by Mr. Lebowitz at the hearing on the motion for reconsideration. *See* Transcript quoted in Appendix C at pp. 352–53, 353–55, 361–63 of the opinion (*infra.*) Counsel seems to have charged for every instance where work of any kind was performed, no matter how routine or duplicative, without regard for whether or not the particular service was beneficial to the estate, except on those occasions when counsel simply forgot to record something on the time sheets. This is the antithesis of billing judgment.

The failure to exercise billing judgment is more likely to occur where counsel is representing a statutory committee than where a private client is involved. In order to cultivate good client relations, to avoid protest and to promote payment, attorneys who represent private clients regularly write off a portion of their fees that are attributable to time which was unproductive or of negligible benefit. Counsel's failure to exercise billing judgment in the instant case by discounting the fee is understandable. The fees charged by creditors' committee counsel are not coming directly out of the client's pocket, but rather from the assets of the debtor's estate. In the typical case, the unsecured creditors bear the expense in the long run by having their distributive share of the estate reduced to the extent that administrative expenses, including fees paid to their committee counsel, diminish the net amount distributable under the confirmed plan. However, in this case, the unsecureds' distribution has been set at 15% of their claims, and the payment of administrative expenses has been guaranteed by Mr. Jed, the corporate debtor's alter ego and the committee's perceived nemesis. The fees will be paid directly by the debtor, the same adversary with which the creditors' committee has been engaged in litigation. Under the circumstances of this case, there was little or no incentive on the part of committee counsel to write off anything.

The Supreme Court has indicated in an analogous context that the failure of counsel to a statutory committee to exercise billing judgment requires such exercise by the court having control over the approval of fees. In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), a class action suit in which counsel for the prevailing party sought fees under the Civil Rights Attorney's Fee Awards Act of 1976 (42 U.S.C. § 1988), the court stated:

> The district court should also exclude from this initial fee calculation hours that were not "reasonably expended." S.Rep. No. 94–1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall,* 205 U.S.App.DC 390, 401, 641 F.2d 880, 891 (1980) (en banc) (emphasis in original).

461 U.S. at 434, 103 S.Ct. at 1939–1940, 76 L.Ed.2d at 51.

RECOMPUTING THE LODESTAR

Because the Court has reconsidered its earlier opinion and has determined to allow compensation for services which were previously disallowed, the lodestar must be recomputed. In so doing, the opinion must begin with the summary of services sub-

mitted by Frank, Bernstein in connection
with the motion for reconsideration:

Summary of Nature of Services Performed by Frank, Bernstein,
Conaway & Goldman on Behalf of Leonard Jed
Creditors' Committee For the
Period July 1, 1986 through October 31, 1988

| Code | Summary of Nature of Services Performed | |
|---|---|---|
| A | Analysis of daily reports, monthly operating statements, and other financial information on the debtor. | |
| | Harvey M. Lebowitz: | 6.5 |
| | Paula K. Merkle: | 1.6 |
| | Joseph A. Guzinski: | .9 |
| | Josef E. Rosenblatt: | .2 |
| | Kathleen G. McCruden: | 10.0 |
| B | Review of motions to approve settlements, correspondence, and telephone conversations with debtor's counsel and others regarding the Creditors' Committee's position, and related matters. | |
| | Harvey M. Lebowitz: | 9.6 |
| | Jay A. Shulman: | .3 |
| | Paula K. Merkle: | 2.5 |
| | Joseph A. Guzinski: | 1.5 |
| | Kathleen G. McCruden: | 1.0 |
| C | Communications with creditors and interested parties on the status of the case, and distributions under the plan. | |
| | Harvey M. Lebowitz: | 1.8 |
| | Paula K. Merkle: | 3.2 |
| | Joseph A. Guzinski: | .2 |
| D | Preparation of Frank, Bernstein, Conaway & Goldman's amended fee application and related matters. | |
| | Harvey M. Lebowitz: | 3.1 |
| | Paula K. Merkle: | 7.7 |
| | Kathleen G. McCruden: | 3.1 |
| E | Review of fee applications and related pleadings in connection with compensation sought by professionals employed by estate, and related matters. | |
| | Harvey M. Lebowitz: | 28.2 |
| | Jay A. Shulman: | .1 |
| | Paula K. Merkle: | 1.6 |
| | Joseph A. Guzinski: | 11.5 |
| | Kathleen G. McCruden: | 3.1 |
| F | Review of debtor's proposed plan and disclosure statement, negotiations with debtor and telephone calls and correspondence with members of Creditors' Committee regarding same, status conferences and hearing on confirmation, and related matters. | |
| | Harvey M. Lebowitz: | 57.9 |
| | Jay A. Shulman: | 31.9 |
| | Paula K. Merkle: | 16.6 |
| | Josef E. Rosenblatt: | 3.7 |
| | Joseph A. Guzinski: | 45.3 |
| | Kathleen G. McCruden: | 40.1 |
| G | Meetings, telephone calls, correspondence with Creditors' Committee re status of case. | |
| | Harvey M. Lebowitz: | 22.9 |
| | Jay A. Shulman | 4.2 |
| | Joseph A. Guzinski: | 3.2 |
| | Kathleen G. McCruden: | 14.9 |
| H | Preparation of and research in connection with Motion for Appointment of Trustee and related matters. | |
| | Harvey M. Lebowitz: | 11.3 |

| Code | Summary of Nature of Services Performed | |
|------|------------------------------------------|---|
| | Jay A. Shulman: | .5 |
| | Joseph A. Guzinski: | 43.0 |
| | Kathleen G. McCruden: | 38.7 |
| I | Review of pleadings in connection with Covington loan, preparation of and research on connection with Motion for Contempt (re distribution of loan proceeds) and related matters. | |
| | Harvey M. Lebowitz: | 20.4 |
| | Jay A. Shulman: | 1.1 |
| | Joseph A. Guzinski: | 45.3 |
| | Kathleen G. McCruden: | 18.7 |
| J | Preparation of Frank, Bernstein, Conaway & Goldman's second fee application. | |
| | Paula K. Merkle: | 1.9 |
| | Joseph A. Guzinski: | 3.2 |
| | Kathleen G. McCruden: | 1.1 |
| K | Objection to employment of Ellin & Tucker as accountants. | |
| | Harvey M. Lebowitz: | 2.4 |
| | Josef E. Rosenblatt: | 1.5 |
| | Jay A. Shulman: | 10.4 |
| | Kathleen G. McCruden: | 1.0 |

The lodestar is calculated by multiplying the number of hours reasonably expended times a reasonable hourly rate. The lodestar fee in this case is determined to be $48,316.35, based upon computation of normal rates times a reasonable number of hours, as set forth in Appendix A.

Based upon the Court's review of counsel's time records, it is determined that the number of hours reasonably required for counsel to properly represent the creditors' committee is 428.5, apportioned among the Frank, Bernstein attorneys and paralegals as follows:

| Attorney | Number of Hours Claimed | Number of Hours Reasonably Required |
|----------|-------------------------|-------------------------------------|
| Harvey M. Lebowitz | 164.1 | 121.0 |
| Jay A. Shulman | 38.1 | 24.2 |
| Joseph A. Guzinski | 164.5 | 123.3 |
| Paula K. Merkle | 35.1 | 35.1 |
| Josef E. Rosenblatt | 5.4 | 5.2 |
| Subtotal | 407.2 | 308.8 |
| Paralegals | 131.7 | 119.7 |
| TOTAL | 538.9 | 428.5 |

## APPLICATION OF THE 12 FACTORS

The Court computes the fee award based upon the application of the "lodestar" factors contained in the leading case of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), which has been applied to counsel fees in bankruptcy by virtually every circuit court. Only one of the factors in the lodestar computation is the actual time spent by counsel multiplied by the usual rate. What the circuit courts mean by this is that counsel's actual expenditure of time is not the sole standard for the award of compensation and that other applicable factors must be considered to either increase or decrease the fee award above or below that which counsel requested.

*Novelty and difficulty of the questions.* "The case presented no novel legal issues to creditors' committee counsel. Despite its assertion that 'this case has presented a number of difficult problems,' the Court finds nothing to distinguish this case from

any number of fairly routine Chapter 11 reorganization cases. The debtor's substantial write-down of inventory and pre-petition receivables does not make this a difficult case. Every Chapter 11 creditors' committee has the responsibility of constantly monitoring a debtor-in-possession. Such monitoring presupposes some services which are routine and non-legal in nature." 103 B.R. at 716.

*Skill requisite to perform the legal services properly.* Because the Court does not view this case as being a difficult one for experienced bankruptcy counsel, it follows that this case did not demand "the highest degree of skill in the performance of legal services to the creditors' committee." *Id.*

*Preclusion of other employment.* "Counsel was not precluded from other employment by taking on the job of representing the creditors' committee in this case." *Id.* at 717.

*Whether the fee is fixed or contingent.* The fee in this case was not contingent in a nonbankruptcy sense. "The fee in the instant case is contingent because of the substantial risk of nonpayment. The Court will take this risk factor into consideration by raising the amount of the lodestar." *Id.* at 718.

*Time limitations imposed by the client or the circumstances.* "Except for a flurry of activity shortly before the debtor's Chapter 11 plan achieved confirmation, there does not appear to have been any urgency for counsel to perform on behalf of the creditors' committee as far as the Court can divine." *Id.*

■ *Amount involved and results obtained.* "According to the debtor's Schedule A-3 ('Creditors having Unsecured Claims Without Priority'), The Jed Co. owed unsecured debts in the aggregate amount of $4,135,868.41. *Statement of Financial Affairs and Schedules* [P. 37]. Under the terms of the debtor's Second Amended Plan of Reorganization [P. 242], Class IV unsecured creditors are to receive a 20% distribution within four years from date of confirmation. Therefore, assuming unsecured debt in the full amount stated,

the total amount distributable to unsecured creditors under the plan is $827,173.68." *Id.* Frank, Bernstein claims a bonus for achieving a 5% increase in the amount unsecured creditors will receive ($206,-793.42) under the plan, for obtaining higher payments "up front" and for shortening the time for distribution from five years to four. The Court does not believe that the result achieved is so extraordinary that the award of a bonus is appropriate in this case. "Nevertheless, counsel's participation in negotiation with the debtor did achieve a favorable result for the unsecured creditors and those efforts ought to be rewarded. For this reason, time spent in negotiation as disclosed in the time records has been compensated at the highest rates charged. The Court emphasizes, however, that this is not a bonus but merely recognition of one of the factors to be taken into consideration." *Id.*

■ *Undesirability of the case in the legal community.* Counsel claims that this case was an undesirable one because of the "aggravation" involved, due in part to the personalities of the parties and their attorneys. To award an enhanced fee on this basis would be improper. Many cases that come before this Court involve the same individuals. It would be unproductive to stigmatize certain members of the bar as "difficult to deal with" and to award higher fees because they happened to be present in a case. In this case, both sides irritated each other. The case itself was not an undesirable one in the legal community.

*Nature and length of the professional relationship with the client.* "This client is a statutorily-created committee under the Bankruptcy Code which counsel was engaged to represent by court order some [five] and one-half years ago. *Order of January 8, 1985* [P. 22]." *Id.*

*Awards in similar cases.* The lodestar of $48,316.35 approximates the standard interim fee awarded to creditors' committee counsel in similar cases.

*Adjusting the lodestar.* "From the foregoing analysis, it is clear that the award of

compensation under a lodestar analysis is far from scientific. The Court in the careful exercise of its discretion has determined the lodestar in this case to be less than the interim fee which counsel has requested, for the various reasons stated. However, the Court must determine the actual fee to be awarded in light of the 12 *Johnson* factors. Some of those made no appreciable difference (novelty of questions, requisite skill, preclusion) because the Court has already implicitly considered them in determining the lodestar." *Id.* at 719.

█ The new lodestar fee computed in this second opinion ($48,316.35) approximates the normal fee allowable in a similar case of this size. However, consideration of the high risk of nonpayment and delay has prompted this Court to increase the fee by $4,831.63, or 10% of the lodestar. *Cooper v. Dyke*, 814 F.2d 941 (4th Cir.1987). This brings the fee award up to $53,147.98.

With respect to out-of-pocket expenses, the Court will allow reimbursement for "heavy" postage, long distance telephone calls, and messenger services, but not for meals or overtime where there is no valid reason articulated to justify such allowances. In the instant case, $3,050.67 will be allowed for compensable expenses. (See Appendix B for a list of disallowed expenses.)

CONCLUDING REMARKS

█ The burden of proof is always borne by the applicant regarding the award of fees in a bankruptcy case. A sufficiently detailed fee application containing a lodestar analysis which is supported by accurate, well-documented records is an absolute requirement. An itemized list of out-of-pocket expenses for which reimbursement is sought and the justification for charging the bankruptcy estate for them must be set forth in the fee application. The fee application must indicate the exercise of billing judgment by disclosing the number of hours "written off" of the requested fee. Failure to exercise billing judgment, excessive use of office conferences and unnecessary duplication of effort will result in the reduction of fees when they are unreasonable in the sound discretion of the Court.

ORDER ACCORDINGLY.

### APPENDIX A—HOW THE LODESTAR WAS COMPUTED

(The Court multiplied the average hourly rate times the number of hours reasonably necessary to perform the services.)

### SENIOR PARTNER, HARVEY M. LEBOWITZ
(Average Rate: $186.35)

| CODE | SERVICE | HOURS CLAIMED | HOURS ALLOWED | FEE |
|------|---------|---------------|---------------|-----|
| A | Analysis of daily reports, monthly operating statements and other financial information of the debtor | 6.5 | 6.5 | $ 1,211.28 |
| B | Review of motions to approve settlements, correspondence and telephone conversations with debtor's counsel and others regarding the creditor committee's position, and related matters | 9.6 | 5.0 | $ 931.75 |
| C | Communications with creditors and interested parties on the status of the case and distributions under the plan | 1.8 | 1.8 | $ 335.43 |

| CODE | SERVICE | HOURS CLAIMED | HOURS ALLOWED | FEE |
|------|---------|---------------|---------------|-----|
| D | Preparation of fee application and related matters | 3.1 | 3.1 | $ 577.69 |
| E | Review of fee applications and related pleadings in connection with compensation sought by professionals employed by estate, and related matters | 28.2 | 20.0 | $ 3,727.00 |
| F | Review of proposed plan and disclosure statement, negotiations with debtor, etc. | 57.9 | 40.0 | $ 7,454.00 |
| G | Meetings, telephone calls, correspondence with creditors' committee re status of case | 22.9 | 22.9 | $ 4,267.42 |
| H | Preparation and research in connection with Motion for Appointment of Trustee and related matters | 11.3 | 5.0 | $ 931.75 |
| I | Review of pleadings in connection with Covington loan, preparation and research in connection with Motion for Contempt (re distribution of loan proceeds) and related matters | 20.4 | 14.3 | $ 2,664.81 |
| K | Objection to employment of Ellin & Tucker as accountants | 2.4 | 2.4 | $ 447.24 |
|  | TOTALS | 164.1 | 121.0 | $22,548.37 |

Reduction in hours: 43.1
Reduction in fee: $7,994.26

#### JUNIOR PARTNER: JAY A. SHULMAN
(Average Rate $128.12)

| CODE | SERVICE | HOURS CLAIMED | HOURS ALLOWED | FEE |
|------|---------|---------------|---------------|-----|
| B | Review of motions to approve settlements, correspondence and telephone conversations with debtor's counsel and others regarding the creditor committee's position, and related matters | .3 | 0 | $ 0 |
| E | Review of fee applications and related pleadings in connection with compensation sought by professionals employed by estate, and related matters | .1 | 0 | $ 0 |
| F | Review of proposed plan and disclosure statement, negotiations with debtor, etc. | 31.9 | 20.0 | $2,562.40 |

| CODE | SERVICE | HOURS CLAIMED | HOURS ALLOWED | FEE |
|---|---|---|---|---|
| G | Meetings, telephone calls, correspondence with creditors' committee re status of case | 4.2 | 4.2 | $ 538.10 |
| H | Preparation and research in connection with Motion for Appointment of Trustee and related matters | .5 | 0 | $ 0 |
| I | Review of pleadings in connection with Covington loan, preparation and research in connection with Motion for Contempt (re distribution of loan proceeds) and related matters | 1.1 | 0 | $ 0 |
| | TOTALS | 38.1 | 24.2 | $3,100.50 |

Reduction in hours: 13.9
Reduction in fee: $1,780.87

### SENIOR ASSOCIATE: PAULA KRAHN MERKLE
(Average rate: $101.34)

| CODE | SERVICE | HOURS CLAIMED | HOURS ALLOWED | FEE |
|---|---|---|---|---|
| A | Analysis of daily reports, monthly operating statements and other financial information of the debtor | 1.6 | 1.6 | $ 162.14 |
| B | Review of motions to approve settlements, correspondence and telephone conversations with debtor's counsel and others regarding the creditor committee's position, and related matters | 2.5 | 2.5 | $ 253.35 |
| C | Communications with creditors and interested parties on the status of the case and distributions under the plan | 3.2 | 3.2 | $ 324.29 |
| D | Preparation of fee application and related matters | 7.7 | 7.7 | $ 780.32 |
| E | Review of fee applications and related pleadings in connection with compensation sought by professionals employed by estate, and related matters | 1.6 | 1.6 | $ 162.14 |
| F | Review of proposed plan and disclosure statement, negotiations with debtor, etc. | 16.6 | 16.6 | $1,682.24 |

| CODE | SERVICE | HOURS CLAIMED | HOURS ALLOWED | FEE |
|------|---------|---------------|---------------|-----|
| J | Preparation of Frank, Bernstein, Conaway & Goldman's second fee application | 1.9 | 1.9 | $ 192.55 |
| | TOTALS | 35.1 | 35.1 | $3,557.03 |

Reduction in hours: 0
Reduction in fee: 0

### SENIOR ASSOCIATE: JOSEF E. ROSENBLATT
(Average rate: $110.00)

| CODE | SERVICE | HOURS CLAIMED | HOURS ALLOWED | FEE |
|------|---------|---------------|---------------|-----|
| A | Analysis of daily reports, monthly operating statements and other financial information of the debtor | .2 | 0 | $ 0 |
| F | Review of proposed plan and disclosure statement, negotiations with debtor, etc. | 3.7 | 3.7 | $407.00 |
| K | Objection to employment of Ellin & Tucker as accountants | 1.5 | 1.5 | $165.00 |
| | TOTALS | 5.4 | 5.2 | $572.00 |

Reduction in hours: .2
Reduction in fee: $22.00

### JUNIOR ASSOCIATE: JOSEPH A. GUZINSKI
(Average rate: $94.23)

| CODE | SERVICE | HOURS CLAIMED | HOURS ALLOWED | FEE |
|------|---------|---------------|---------------|-----|
| A | Analysis of daily reports, monthly operating statements and other financial information of the debtor | .9 | .9 | $ 84.80 |
| B | Review of motions to approve settlements, correspondence and telephone conversations with debtor's counsel and others regarding the creditor committee's position, and related matters | 1.5 | 1.5 | $ 141.35 |
| C | Communications with creditors and interested parties on the status of the case and distributions under the plan | .2 | 0 | $ 0 |
| E | Review of fee applications and related pleadings in connection with compensation sought by professionals employed by estate, and related matters | 11.5 | 11.5 | $ 1,083.65 |

| CODE | SERVICE | HOURS CLAIMED | HOURS ALLOWED | FEE |
|------|---------|---------------|---------------|-----|
| F | Review of proposed plan and disclosure statement, negotiations with debtor, etc. | 45.3 | 31.3 | $ 2,949.40 |
| G | Meetings, telephone calls, correspondence with creditors' committee re status of case | 3.2 | 3.2 | $ 301.54 |
| H | Preparation and research in connection with Motion for Appointment of Trustee and related matters | 43.0 | 30.0 | $ 2,826.90 |
| I | Review of pleadings in connection with Covington loan, preparation and research in connection with Motion for Contempt (re distribution of loan proceeds) and related matters | 45.3 | 31.3 | $ 2,949.40 |
| J | Preparation of Frank, Bernstein, Conaway & Goldman's second fee application | 3.2 | 3.2 | $ 301.54 |
| K | Objection to employment of Ellin & Tucker as accountants | 10.4 | 10.4 | $ 979.99 |
| | TOTALS | 164.5 | 123.3 | $11,618.57 |

Reduction in hours: 41.2
Reduction in fee: $3,882.28

KATHLEEN G. McCRUDEN: PARALEGAL
(Average rate: $57.81)

| CODE | SERVICE | HOURS CLAIMED | HOURS ALLOWED | FEE |
|------|---------|---------------|---------------|-----|
| A | Analysis of daily reports, monthly operating statements and other financial information of the debtor | 10.0 | 10.0 | $ 578.10 |
| B | Review of motions to approve settlements, correspondence and telephone conversations with debtor's counsel and others regarding the creditor committee's position, and related matters | 1.0 | 1.0 | $ 57.81 |
| D | Preparation of fee application and related matters | 3.1 | 3.1 | $ 179.21 |
| E | Review of fee applications and related pleadings in connection with compensation sought by professionals employed by estate, and related matters | 3.1 | 3.1 | $ 179.21 |

| CODE | SERVICE | HOURS CLAIMED | HOURS ALLOWED | FEE |
|------|---------|---------------|---------------|-----|
| F | Review of proposed plan and disclosure statement, negotiations with debtor, etc. | 40.1 | 28.1 | $1,624.46 |
| G | Meetings, telephone calls, correspondence with creditors' committee re status of case | 14.9 | 14.9 | $ 861.37 |
| H | Preparation and research in connection with Motion for Appointment of Trustee and related matters | 38.7 | 38.7 | $2,237.25 |
| I | Review of pleadings in connection with Covington loan, preparation and research in connection with Motion for Contempt (re distribution of loan proceeds) and related matters | 18.7 | 18.7 | $1,081.05 |
| J | Preparation of Frank, Bernstein, Conaway & Goldman's second fee application | 1.1 | 1.1 | $ 63.59 |
| K | Objection to employment of Ellin & Tucker as accountants | 1.0 | 1.0 | $ 57.81 |
| | TOTALS | 131.7 | 119.7 | $6,919.86 |

Reduction in hours: 12
Reduction in fee: $693.75

TOTAL HOURS REDUCED: 110.4
TOTAL REDUCTION IN FEE: $14,073.13
LODESTAR FEE: $48,316.35

APPENDIX B—DISALLOWED EXPENSES

| | |
|---|---|
| Secretarial Overtime | 241.09 |
| Meals | 89.00 |
| TOTAL | $330.09 |

APPENDIX C

EXCERPTS FROM THE HEARING ON THE MOTION FOR RECONSIDERATION, NOVEMBER 30, 1989

MR. LEBOWITZ: Your Honor, this may be peculiar for a witness to do, but what I told Mr. Shulman I would like to do—he will be asking me a whole bunch of questions and I will be responding, but I'd like to be able to discuss my response with the Court. If the Court has any questions, I'll answer the question. And perhaps have a somewhat discussionary kind of testimony if that meets with the Court's approval.

JUDGE SCHNEIDER: Well, what I think we ought to do is dispense with the questions in the interest of saving time and permit you to make the statement from the witness stand.

MR. LEBOWITZ: I'd rather not, Your Honor. I'd rather do it on the record with questions.

JUDGE SCHNEIDER: Well, it's going to be on the record, but—

MR. LEBOWITZ: No, but there are many, many points raised by the Court in

the Memorandum Opinion that need to be addressed and addressed specifically.

Let me first say that there was no intent on anybody's part for vengeance against Mr. Jed or for Mr. Jed to have to pay the additional dollars. Your Honor, we represent a client; the client is the committee. The committee gives us instructions, the committee gives us directions, and provided those directions and instructions are legal and valid and have merit, we carry them forward.

Mr. Jed, being a curmudgeon, had nothing to do with a vengeance motive. That was simply evidence of the difficulty and the additional work that had to be done by the committee in order to get this case moved to the point where there could be a confirmation.

JUDGE SCHNEIDER; Well, let me interrupt you and ask this question then. In a typical fee application, especially where there is an objection, counsel normally stands up in Court and says, "Your Honor, there are a lot of things not included in this fee application. We wrote off 10, 20, $30,-000 worth of work." And if you go through this fee application line by line, it doesn't appear to me that anything is written off.

MR. LEBOWITZ: No, and nothing should be written off in this application, not one penny. In the *Wilke* case, we wrote off $26,000 because we thought that the services were not adequately provided. In this case, and you'll hear it in testimony, not one cent should be written off. The work was done, the work was competently done, the work was required. Some of the required work was caused because of Mr. Jed himself.

JUDGE SCHNEIDER: Yes, but let me interrupt again. And don't you see the problem with that statement where, number one, you as lead counsel earning the highest rate in the firm did the lion's share of the work.

MR. LEBOWITZ: Wrong, Your Honor.

JUDGE SCHNEIDER: It's evident—let me just finish. It's evident that you did the lion's share of the work. And then, at the same time you've got interoffice conferences and you've got other people doing other things that you have to have interoffice conferences about.

MR. LEBOWITZ: May I address two of those things? First of all, Your Honor is laboring under a misconception. I did not do anywhere near the lion's share of the work. You don't look at the rates. You look at the time. My time in this case is 25 percent of the total time; maybe 30 percent. At the time, Mr. Shulman was an associate. It is totally inconsistent to say, "Delegate the work," and then say, or have the notion that once the work is delegated, there should be no communications or conferences. That way, you can't delegate. You must do it all yourself. Someone has to bring it together. That's the purpose of lead counsel. That's the way it's been done in my 35 years of practice.

JUDGE SCHNEIDER: Well, let me interrupt again. If that's true, then how is it that you had a 163.8 hours, which was more than any other single person in the firm?

MR. LEBOWITZ; More than any other single person, but on the whole, my total hours come to about one—about 30 percent of the total hours. You'll look on here, Your Honor, and I'll go through it, you will find in many instances where we—there is an entry of conference. That conference was not a conference in the formal sense. Paula Merkle ran into me in the hall or stepped in my office, asked me a question, got some direction. It was a one point—.1 on hers; I charged nothing for that. Page 24, line 15 to page 27, line 20.

\*   \*   \*   \*   \*   \*

JUDGE SCHNEIDER: What about the fact that you did all the review work. Why wasn't that delegated?

MR. LEBOWITZ: It's our practice whenever a pleading is filed—and it was. It was. I did not draft the pleadings. You will see time on here of 15, 20 hours for drafting a pleading by Ms. Merkle, by Mr. Shulman, by Mr. Guzinski. You'll see one hour of my time reviewing it. The practice

of my firm, and I think many others, is no pleading goes out of the office without the name of a partner. And you've got a sliding scale. The more experienced and the more senior the associate, the less the review. The more junior and less experienced the associate, the more the review. So when I'm reviewing a paper that's prepared by Mr. Shulman who was then a senior associate, the time I spent on that review is de minimis, but I still must review it. I have to review it because I've got my firm on the line. I'm concerned that a partner having to sign it, I would never sign a paper unless I've looked at it. But those reviews are very, very de minimis. And you'll see, all the way through here, a very little bit of time for review of papers prepared by Mr. Shulman. Basically, the same thing is true with Ms. Merkle; very little time. But with Mr. Guzinski who had just come with us, had very little experience, it needed a great deal of review.

Now, that doesn't mean that Mr. Guzinski's time should be written off, or that any of that time was not time well spent because to the extent that Mr. Guzinski spent the time, it cost me far less time at my rates which were three times what Mr. Guzinski's were.

Page 28, line 24 to page 30, line 3.

\*   \*   \*   \*   \*   \*

JUDGE SCHNEIDER: Well, let me interrupt again, or at least follow up again, if that is the case that there isn't going to be anything written off and point up to the same extreme example that the opinion pointed out in one of the footnotes. There is an item which appears as "Lebowitz Entry No. 100," the $40 item—that may be small potatoes compared to the rest of the fee application—

MR. LEBOWITZ: Where does that appear, Your Honor?

JUDGE SCHNEIDER: It is in the opinion, in the printed opinion, at page seven—

MR. LEBOWITZ: I don't have a copy of the opinion.

JUDGE SCHNEIDER: —716. I don't have the typescript copy.

MR. LEBOWITZ: Will you read it to me?

JUDGE SCHNEIDER: This is in 103 Bankruptcy Reporter 706 at 716, and it is in the Court's prepared appendix which is the fee application which was prepared by me with analysis. Entry No. 100 of July 2, 1987—

MR. MUSGRAVE: Your Honor, I think it's—

JUDGE SCHNEIDER: —which is entitled "Attempt to contact Herb Better, .2 hours, amount charged $40." And this is on your time record, and I just question whether you even placed the phone call yourself.

MR. LEBOWITZ: No, not only did I place the phone call myself, but I talked to Mr. Better's secretary and left a message for him with the details of what I wanted.

JUDGE SCHNEIDER: And why wouldn't you think that this is the sort of thing that ought to be written off? This isn't something you would have charged to any client, is it?

MR. LEBOWITZ: Why would a lawyer write off anything? Your Honor, there are apparently—

JUDGE SCHNEIDER: Let me—you don't think that you should write anything off? Isn't that what the exercise of billing judgment is?

MR. LEBOWITZ; Your Honor, I will go through—I have not charged. It's not a question of writing off. I have not charged for many, many things. All these conferences that are on here, I don't charge a penny for a good number of them. It's not a question of what is—in non-bankruptcy practice, and we have a lot of that—I have a large firm. Our litigation people in a litigation matter have teams of three and four who work on a single case. In the nonbankruptcy practice, there is no demarcation between minor and major because I don't know what that is. I don't know where you draw the line. But if something is happening in a case and whatever action it is, is toward forwarding the client's interest in that case, it is a perfectly proper charge. And if I'm making a

phone call to Herb Better in connection with—and I can suggest what it is. He was the one that was telling me why the accountants refused to certify to the inventory with Mr. Jed, and he was also telling me some other things that we discovered later on in connection with some payments going back and forth. They are very important to me, and that's why I'm talking to Mr. Better. It is furthering the case. Now, if I spoke to his secretary because I couldn't reach him, I gave her the message of why I wanted to speak with him.

Now, I think the mistake is made by "attempt to reach." But when attempt to reach is on one of the detailed billing sheets, the attempt to reach is you spoke with somebody in his office. It wasn't that you just punched the buttons.

JUDGE SCHNEIDER: Let me ask this. I know this is a philosophical argument, but it appears throughout the brief in support of the Motion for Reconsideration; and that is, it seems to me, the premise that the applicant has here is that "we could have charged this if we were doing non-bankruptcy work and it would have been paid without any objection, and therefore, it ought to be allowed in the Bankruptcy Court." And my concern with that premise is this. If that is true, the Court has no role in reviewing the fee application because there has to be some objective limit, I think, put upon fees that are charged, and number two, doesn't that beg the question that even fees that are charged outside of bankruptcy are always consented to. There is not, necessarily— there is the opportunity, let me say, for objection even to—

MR. LEBOWITZ: Oh, sure.

JUDGE SCHNEIDER: —even to a non-bankruptcy fee.

MR. LEBOWITZ: It isn't that they're not charged, but in a nonbankruptcy context, when a client gets—and we send along with our bills a copy of the Detailed Billing Report, so they have the same sheets that we submit to the Court. It's no different than we give to the Court. It's exactly the same sheet. The one we sub-mitted a few days before the hearing to Mr. Musgrave and gave the Court at the hearing. The one that the Court went line by line on. That's the same paper that we give to clients.

Certainly, periodically, the client will call us up and they'll say, "Well, what is the charge for? What happened here?" and you respond to it. And sometimes you say, "Well, all right. Maybe that was—maybe there was some wheel-spinning there, and maybe it ought to be reduced." Or you call the associate in because it's associate time, and you ask the associate, "What did you do here?" I mean, "Why did you charge $500 for doing this thing that, in my mind, could have been done for, say, $300?" And if you feel that it needs to be adjusted, it's adjusted.

The difference is that in this particular case, the Court didn't ask any questions about why it was this and why it was that. The Court simply said, "I'm going to disallow it." If the Court had some problems in connection with an item on our printout, there's no reason why the Court can't ask us those questions at a hearing on the fee application.

Now, as lead counsel, I check these things very carefully. And I'm not lead counsel on all the cases. Although the case may come to me, I may give it to Irv Walker and say, "Here, it's your case, and you manage the case, and you divide up the responsibilities." In this case, it was mine. I reviewed the printout. I reviewed the billings. I thought they were fair. And if Your Honor will permit stories when I was on the bench? What I would do—because the Court does have a very significant duty to review fee applications. I never did it line by line. I knew the case, as Your Honor knows the case, because I sat through all the proceedings in the case. I knew the counsel. I saw the work product of the counsel. I knew the integrity of the counsel. I knew whether or not they were spinning wheels. I knew from my experience in private practice what it ought to take to do a specific job. And if I felt that the time it took to do this job was too much, I cut it back. And I can give you

some references for attorneys in D.C., two or three I have in mind right now, who were very offended because I thought as a senior counsel, as a senior partner in the firm, they should—and it's their time—they should have taken less time to do that work, but not on a line by line basis. On an overview of the whole case, whether in my estimation, based on my experience in practice, whether or not the fees were fair and reasonable, whether there was spinning of wheels, whether there was too much duplication of effort, and Your Honor, duplication of effort is not meeting with associates. Duplication of effort is not having two associates at a meeting because it's absolutely necessary when you have meetings of a Creditors' Committee to have associates there. The associate is the one who prepares all the details that you need for the meeting. You're not doing that because you're handling the overview. You're handling the broad scope of it, the global part of the meeting. The associate is handling the statistics. He's the one that's bringing all the numbers in. He's the one that's asking some questions. He's the one that's being given directions at that meeting which he is to follow out after the meeting has concluded. So that I'm not the one that does it. It would make no sense for him not to be at a meeting, and me to go to the meeting and meet with him afterwards and tell him what happened at the meeting. First of all, I may miss some things that happened. He may have had some questions he could have raised. And to now delegate to him the responsibility of doing the activity that has to be done as a result of the meeting, not having been there is inefficient. It is a waste of money. It is not the way to practice.

And in court, Your Honor knows that while one person is busy examining a witness, you need someone there to take the notes, and you need someone there to argue the law. And you've seen how I generally do it. I will handle the testimony part and my co-counsel will handle the arguments. For me to do both is impossible especially on the fast tracks that we have in the Bankruptcy Court.

So we do it expeditiously. I think that we delegate responsibilities in an efficient, in a productive, and in a manner that will create less costs. And clients just don't complain about it. That's why they come to the firm. They figure that you're going to be able to give them better service, more efficiently and more competently, because you've got all these support facilities and all these associates you could use to help you.

JUDGE SCHNEIDER: Well, let me ask this as a follow up to that. I know one of the complaints about the way this case was decided was that the Court did a line by line examination of the fee application, but it seemed to me at the time that that was the only objective way that I could compute the number of hours that I thought were reasonable with respect to the work that was done, or at least reasonable with respect to how the work was reported to have been done. Now, you're telling me that you prefer to have a subjective evaluation of the time, as opposed to an objective evaluation of the time, and that you would be happier to have—

MR. LEBOWITZ: Your—

JUDGE SCHNEIDER: Let me finish—to have the record compiled in that way? That that would be easier for you to live with?

MR. LEBOWITZ: Your Honor, first of all, the line by line item is not objective because Your Honor is making subjective decisions on a line by line basis. It's no different than making subjective decisions on the overall fee application.

JUDGE SCHNEIDER: Wouldn't you think it would be easier—

MR. LEBOWITZ: Your—

JUDGE SCHNEIDER: —for you to attack, though, on a reconsideration or on appeal, as opposed to a subjective way where—what basis do you have to attack the subjectivity of the Court?

MR. LEBOWITZ: You can't—Your Honor, I—

JUDGE SCHNEIDER: Saying, well, I think 40 hours instead of 39.6?

MR. LEBOWITZ: Your Honor, it's my contention, my position, I think the position of the Bar, you cannot do it on a line by line basis. First of all, we have codes on these pieces of paper. I don't know whether you've ever seen one of our time sheets.

JUDGE SCHNEIDER: Sure I have, in about 30 cases.

MR. LEBOWITZ: No, no, no. You're looking at the Detailed Billing Report.

JUDGE SCHNEIDER: I've seen the time records, too. They're slips of paper.

MR. LEBOWITZ: All right. The time sheet is a green piece of paper that has a bunch of codes on it. And I will admit that it's very confusing because what you do is you first put in the code, and then later on there's a separate line at the right side where you put more details. So it looks like when you see the code and you see the details on the line that it's duplication. Well, it isn't. We sometimes, when you use the code, just don't have a description that fits exactly.

And with regard to looking at it on a line by line basis, you can't tell looking at it on a line by line basis unless you ask a specific question about that line, like you did about "attempt to reach Better." What does that mean? What is "attempt to reach Better?" Now, if I had to put out all my—which it's impossible to do in the press of business and our computer won't even—doesn't even have enough characters to do it—if I had to put down on that line the entire context, all the details of that attempt to reach Better, then I would be spending all my day just writing out—it would cost—it would be a .5 instead of a .1 or a .2 because of the details I have to write out.

So you can't do it on a line by line basis. You have to do it on an overall view of the case, your knowledge of the case, your respect for the counsel in the case, your belief in their integrity, and to the extent that something just pops out in connection with—when you look through some of the narratives and glance through—I'm not suggesting you don't glance through the printout, but to tear down line by line just doesn't make any sense.

Page 37, line 20 to page 47, line 3.

\* \* \* \* \* \*

JUDGE SCHNEIDER: Now, don't you recognize that there's perfectly respectable authority for the point that you can't allow everyone in a firm who is in a conference to be compensated—

MR. LEBOWITZ: I totally disagree with it.

JUDGE SCHNEIDER: —at the full amount?

MR. LEBOWITZ: I don't know how respectable the authority. I know there's an authority out there that says it. I just—

JUDGE SCHNEIDER: Well, let's put it this way. There is authority on almost every issue in this case, pro and con, depending upon what court you look at.

MR. LEBOWITZ: That's right. And I just—

JUDGE SCHNEIDER: And some of them are pretty—

MR. LEBOWITZ: I simply disagree with that. There's no other field of law—and we don't just do bankruptcy work in my department; we do commercial litigation, we do a lot of real estate work that may be bankruptcy related, we represent a whole lot of landlords outside the context of bankruptcy. I have another seven or eight special departments in the firm. In every case, there is conference. You cannot practice law—that's why they come to the firm. They come to the firm because they know you're going to have the benefit of this expert, and that expert, and this associate, and that associate. But the ultimate responsibility is on the responsible partner, the partner who is the lead counsel in the case, and he has to pull it all together. There's no way on God's earth he can pull that together without having conferences. There's no way you can send an associate out on a task without having a conference with the associate, or a memorandum with the associate, or discussion with the associate, giving him the parameters of the job he does, and then reviewing it afterwards. And if you have an associate doing a plead-

ing, or any kind of document, it would be foolhardy to expect not to review that and have a conference with the associate if it needs to be revised.

So conferences are—it's a normal fact of life. I can give you some instances that can make your hair stand up. If you go up to New York, you're going to be hit with three, four, and five people at a conference. We keep it down to a minimum. I don't think at any conference that I'm aware of that I've had in this case that we've had more than two, some cases one. Where it's not necessary to have two, we don't have two. But if something is going to have to be taken, some additional action is to be taken as a result of the meeting, I want that associate at the meeting with me to hear what went on so that he would have his instructions to take away from the meeting and fulfill whatever activity he has to do. It would be a total waste of time for me to do it a second time with him.

So I totally disagree with those cases that say only one party can charge for a conference. That's not the way law is practiced.

JUDGE SCHNEIDER: And this is typical in non-bankruptcy matters, as well.

MR. LEBOWITZ: It's typical, yes, more so, but we try to keep it to a minimum in bankruptcy. Our litigation department has—they work in teams. I have seen as many as five on the team work on one case. I don't think, except in the case like the *LBH* case where there were so many things that had to be done, that we used any great number of attorneys in a case. We'll have maybe two.

JUDGE SCHNEIDER: The difference, I think, in philosophy on this point is that the compensation ought to be for work actually performed. And if carried to the most illogical extreme, you could have conferences every day in a case, as you said happens in other jurisdictions, by any number of people and the case could be totally eaten up without any substantive work having come from it.

MR. LEBOWITZ: I don't know—

JUDGE SCHNEIDER: Let me just follow up on what I just said. I think we were both at the recent meeting of the National Conference of Bankruptcy Judges in Boston when Mr. Feinstein [Nathan B. Feinstein, of the law firm of Piper & Marbury] made his speech with respect to his view of the penny-pinching attitude of some courts. He didn't mention me, but he came up afterwards and said, "I didn't mention you."

MR. LEBOWITZ: He came up to me before and said he wouldn't mention you.

JUDGE SCHNEIDER: And I wish he had mentioned me because one of the things he said, which I was astounded at, was that he would like to see fee applications where the attorney charges for time spent thinking about the case.

MR. LEBOWITZ: There's nothing wrong with that.

JUDGE SCHNEIDER: And he thinks that's fine. And my question—I wish he were here today—my question to him and I guess to you is, how can you objectively evaluate a fee application that would contain something about time spent thinking. I mean, you could be—and I've heard of cases where people have charged time for thinking about a case while they were home. They woke up at 3:00 o'clock in the morning and for an hour, between 3:00 and 4:00 a.m., they thought about the case, and they charged on a fee application for that because later on it led to some novel argument that was brought up at a hearing.

MR. LEBOWITZ: Why is that not compensable, Your Honor?

JUDGE SCHNEIDER: But, come on—

MR. LEBOWITZ: I mean, I don't understand what you mean by substantive and productive. Many times, on my way home, on my way home from work, when we have a complex case, I will think of something, all right? More often than not, I forget to mark it down only because I forgot to mark it down. But there is nothing in my mind that says that's not compensable. It is. There is a rule of thumb, and I don't know—I know that some law firms use this; I don't know that we don't—that the

minimum time you charge is a .2. The reason for that is because you think about it before you make the call, you think about it after you make the call, and the time for shifting gears to make the other call makes up the other—let's assume that it's only a .1 on the call itself, there's another .1 in the shifting of gears and the thinking process, and they feel that's perfectly compensable. I don't advocate that, but nevertheless, there is certainly—things have to be thought out. Not everything gets put down on paper. As a matter of fact, I may spend an hour or two before I put one word down on paper thinking of the structure that this is going to take and the chronology of how I have to list it, the arguments I'm going to raise, and this is how I train the people who work with me. I train them, don't just go headstrong into this, don't put a bunch of stuff down on paper just to give it to me; make it make sense. I want to be able to sit there and read it in logical fashion. If it's not logical, you haven't done a job. So if they sit there for an hour—and I have seen them sit there for an hour like they're dreaming; they're not. They're not. They're thinking of how to structure the best argument they can. And that's the way practice is done.

JUDGE SCHNEIDER: Well, I don't have any problem with that last line, "that's the way practice is done," because I know that's how it's done, but it seems to me that everything with respect to what was done in a case has to relate to a task. So it just can't be thinking about the case. And—

MR. LEBOWITZ: But, that—

JUDGE SCHNEIDER:—and it is relevant to a task because that time spent thinking is included in whatever the particular entry might be; two hours, three hours spent in preparing a motion. Well, obviously time was spent thinking about it, researching the issues. But I think to make a statement that "we ought to be able to charge for time spent thinking as pure thought" is ridiculous.

MR. LEBOWITZ: I—

JUDGE SCHNEIDER: First of all, it's ridiculous because it can't be objectively evaluated.

MR. LEBOWITZ: I don't agree with Your Honor.

JUDGE SCHNEIDER: And if you're going to tell me what you would have done as a judge, or what you did as a judge, I am sure that you would never have approved an entry—

MR. LEBOWITZ: Oh, I would never—

JUDGE SCHNEIDER: —for thinking.

MR. LEBOWITZ: Your Honor, if lawyers wanted to abuse the applications, all they would have to do is simply put on their time sheet—they wouldn't put "thinking" down; they'd be stupid to put "thinking" down. What they would do is put "drafting so and so," all right? And that additional hour would be shown in the drafting stage. It would not be shown in the thinking stage. I don't think anybody would put down "thinking," although I think it's more honest, and I think it's compensable than put down "drafting" when one hour was spent thinking and drafting.

If I didn't want to put "conference" down here because Your Honor seems to have a concern about conferences which is absolutely essential to the practice of law, but you seem to have a problem with having conferences. I don't need to put the word "conference." I can put something else, all right? But that's not really true. That's really not—you know, it's a conference, but when I went back to the office, or the attorney went back to the office, and did something. So, for the 1.1 that they have on the conference, they could have simply added the .1 to whatever the activity was they were performing. But because we've got these codes and they did see me fact to face even though it may have been a chance meeting in the hall, they put down conference.

Now, that's not an abuse. That is a fair and complete disclosure. So if we have to tap dance around making complete and fair disclosures by calling it something that it isn't, I think that's a disservice. I would

never do it. I mean, I would rather take the chance of having my fee slashed than take the chance of putting something in there that I didn't do.

JUDGE SCHNEIDER: Well, I think that's an absolutely correct statement. I wouldn't have thought anything less from you. But let me just tell you—

MR. LEBOWITZ: But, if Your Honor's doing to say I can't charge for it, what am I going to do?

JUDGE SCHNEIDER: Well, this is the problem, also, that I see on the disallowance of various out-of-pocket expenses that the Court is disallowing. If I disallow recompense for any number of things: overtime, meals, xerox, travel, or any one of those individual categories, and I'm not saying you would do this, I'm saying as a practical result the items, I think, would be, if not recategorized, the fees would be raised, or the rates would be raised, and we'd just be getting fee applications that ask for a higher fee and perhaps omitted any reference to recompense or out-of-pocket expenses being reimbursed.

MR. LEBOWITZ: Well, it isn't so easy in a large firm to get a higher rate. The rates are set. We have no managing partner at Frank, Bernstein. We have a 14 member management committee on which I sit. The fees—the rates, are developed by the management committee, and then submitted to the partners for any kind of objection. You just can't charge different kinds of rates.

It would be unfair to all the clients if you have an extraordinary service that has to be performed for one client that's charged across the board to the overhead of the firm because the overhead is one of the driving forces as to what creates the rates. So to increase rates because one client has $10,000 of extraordinary services performed for it is totally unfair to the other clients who now across the board have to bear it.

With regard to the charges we have on here, and I said, there are two overtime secretary charges I can't pinpoint. I don't

know why they worked overtime. But when you have a crunch—in some instances we had mailings. After the confirmation hearing, or before the confirmation hearing, after we agreed, we had to send out a large mailing to all of the creditors to recommend that they accept the plan. That was to all the creditors; $4 million worth of unsecured creditors.

JUDGE SCHNEIDER: Well, let me interrupt right there and say that I don't have any problem at all with what—

MR. LEBOWITZ: But that's one of the ones you kicked out.

JUDGE SCHNEIDER: Well, that may well be one of the things that will be reconsidered because one of the things that I think is absolutely reimbursable is what I call "heavy postage," which I think covers a large mailing of notices or the king of things you're talking about right now.

MR. LEBOWITZ: We only charge for extraordinary postage; not the day-to-day thing.

JUDGE SCHNEIDER: No, but the thing that surprised me was that on the time records that were submitted, there were at the end of each month amounts listed for postage, and they might be three dollars or five dollars or ten dollars, and when they all add up, they come to maybe $100 or $200. And I don't think that's properly reimbursable, is it?

MR. LEBOWITZ: We're very careful about that. That postage had to do with some extraordinary mailing for this particular client. Long distance calls; why should another client be charged for the long distance calls that are being made for this client.

JUDGE SCHNEIDER: And long distance—

MR. LEBOWITZ: It's not overhead.

JUDGE SCHNEIDER: Long distance calls may be something else, too.

MR. LEBOWITZ: And the secretary time we have in here, Your Honor, has to do with the preparation of the discovery, and that was in a very pinched time frame between the order establishing—or the no-

tice of the hearing and the hearing date for the motion for the trustee and for the objection to confirmation. There was a whole bunch of discovery that was going on at that time, and we had to keep secretaries overtime to handle the drafting of the discovery requests. And that would be unfair—it was an emergency, it had to be done, it had to be done quickly, we had to keep secretaries overtime. As a matter of fact, some of the names on the sheet are names of secretaries we had to pull down from other departments to help us get this stuff out, and that should not be charged to another client. It should be charged to this case.

Page 47, line 24 to page 58, line 10.

\*    \*    \*    \*    \*    \*

JUDGE SCHNEIDER: Don't you acknowledge that there is a greater scrutiny given to a fee application and time records when an objection is made than when there isn't any? And in light of that, if you do, shouldn't you have been ready to take some action to exercise billing judgment on some of the more questionable entries of the time records?

MR. LEBOWITZ: May I answer that?

JUDGE SCHNEIDER: Sure.

MR. LEBOWITZ: No. We thought the Court would follow the same practice it had in the past. In the *LBH* case, there were objections to every fee application, and Your Honor didn't even want to hear testimony.

JUDGE SCHNEIDER: Well, we didn't even have a hearing, really, on some of those. But my point is this. I know, and without getting into some of the whys and wherefores, I know that there were efforts made between the parties from the time this application was filed and the objection was interposed to it to work out somehow a settlement between the two sides. Don't you think this was a case in which there should have been a settlement at least by the applicant agreeing to reduce the fee somewhat and exercise some billing judgment?

MR. LEBOWITZ: Your Honor, you keep saying that, and I have to take issue with that. There is nothing to reduce, and I will stand by that. There is nothing to reduce. If the Court reduces it, the court reduces it. I'm not going to reduce something I think is an absolutely valid, good, productive charge. And in connection with negotiations, it was like everything else in this case, it was almost impossible.

JUDGE SCHNEIDER: Let me ask this. What about the *Hensley* case in which the Supreme Court, not dealing in a bankruptcy setting, said that there has to be billing judgment shown to have been exercised?

MR. LEBOWITZ: I exercised the billing judgment, Your Honor. You may not agree with it, but I exercised the billing judgment as I did in the *Wilke* case and knocked off $26,000. There was nothing to knock off in this case.

JUDGE SCHNEIDER: But—

MR. LEBOWITZ: If there were, it would be so de minimis, it wouldn't be worth the effort.

JUDGE SCHNEIDER: But doesn't the fact that you make a statement like that show that there really hasn't been any meaningful billing judgment exercised?

MR. LEBOWITZ: No, sir. To the contrary, I have said at least three times and I'll say it again, I reviewed the bills, I reviewed the printouts, I reviewed the work, I helped prepare this Master Summary. I've looked at it, I would not reduce anything on here.

JUDGE SCHNEIDER: This is the most difficult point for me to reconsider because it's evident to me that there hasn't been any billing judgment exercised, and the statement that there's nothing to reduce only reinforces my inference that there really hasn't been any billing judgment exercised.

MR. LEBOWITZ: Well, I think Your Honor better hear the testimony then. I am convinced that, in my mind, I have exercised [it].

JUDGE SCHNEIDER: Well, let me ask this, if that's the bottom line, what do you

think billing judgment means with respect to a fee application of this magnitude?

MR. LEBOWITZ: Well, first of all—

JUDGE SCHNEIDER: Don't you think it means that some charges of necessity have to be written off because either they're so de minimis with respect to what they actually involve, or they really produce no beneficial result of any kind?

MR. LEBOWITZ: I disagree with both those statements. De minimis is chargeable. I mean, I don't know where you draw the line from de minimis or major. Anything that is done in connection with the proper representation of a client is a valid, compensable charge. It is not de minimis. What does happen as a practical matter is, as I've said, things fall through the cracks because they are so small that you don't even bother to put them on a time sheet. That's got nothing to do with whether it's compensable. There are many things. In these conferences where I will go through it where I don't have anything on my time sheet, but another attorney does, all right? Now, I have lost that time, but there is no reason why I should not have put that time on my sheet because it is also billable time. So I don't believe that it's de minimis.

And as far as productive [work] is concerned, everything that's done in the case in order to reach a result—sometimes you can prepare for weeks for a trial and lose. That doesn't mean the work that you did was not productive. It is productive work. Everything that was done here, even by Mr. Guzinski who was the most junior of all, I came to the conclusion it was productive and was a step toward accomplishing the goal of our client, the committee. If he hadn't done it, I would have had to do it.

Now, it is perhaps possible that maybe he should have taken 15 minutes less here, or half an hour less here. I made the judgment that within my experience for a junior associate, somebody just coming in, that the time that he has billed is reasonable.

JUDGE SCHNEIDER: Well, this may be—and I don't mean to be badgering the witness, but—

MR. SHULMAN: You're allowed to, Your Honor.

JUDGE SCHNEIDER: So this may be argumentative, but don't you think the lawyers from Washington who spent more time doing those tasks that you thought they should have spent when you cut their fee applications were thinking the same thing you're thinking now in terms of the exercise of billing judgment? In other words, they would have said the same thing; that every minute we spent was productive?

MR. LEBOWITZ: Well, two problems with that, and one was the rates charged in Washington were extremely high, a lot higher than they are here. I didn't argue with the rates because the Code says whatever the rates are in that market is the rates that we have to, at least, recognize.

With regard to what I believed the task that was undertaken by the senior partner and being charged in full for it was a task that he should have been able to do in a shorter time because he's the senior—if he's not able to do it in a shorter time, he's not the bankruptcy lawyer I thought he was.

JUDGE SCHNEIDER: Let me ask this, then. You say that some time fell through the cracks, and therefore, was not reported. There was some time written off, was there not? Is that what you—

MR. LEBOWITZ: I don't think there was any time written off in this case.

Page 70, line 1 to page 74, line 22.

\*　　\*　　\*　　\*　　\*　　\*

MR. LEBOWITZ: What I think I've said, Your Honor, is that I have not charged for many of these items that are referred to as conferences. To that degree, you can call it a write-off. But it wasn't a write-off; it just slipped through the cracks. It was such a short period of time that something else apparently happened to take my attention away from it and I just didn't enter it on my time sheet. And that happens every day. We tell our associates, and some of

us even require—don't require—but suggest our associates have tape recorders so that when they finish the task, they just say something into the machine so they won't forget about and move on to the next thing because it happens so rapidly.

JUDGE SCHNEIDER: Let me ask this as a follow up to that. Why does there have to be this kind of minute timekeeping in terms of every single second, apparently, being ascribed to a case? I think that's—

MR. LEBOWITZ: It isn't.

JUDGE SCHNEIDER: That's an incredible system.

MR. LEBOWITZ: It isn't. That's what falls through the cracks. The problem is you cannot, you cannot under any circumstances, no matter how much you try, keep track of all of the time. Without getting paid for the time, and that's all lawyers sell, they sell their services, the law firm and the lawyer loses money. So the extent that work has been performed, it ought to be charged for. And I don't understand what de minimis means. De minimis is—as long as it's work that was done on the case, it is not de minimis. Point one would be, in the Judge's opinion, de minimis. In my opinion, it is not de minimis if somebody comes in and says, "Look, I need some direction on how to prepare this motion." and I say, "You do it this way." And that whole conversation may have taken six-tenths. I may have taken one-tenth, all right; six minutes, or even less than six minutes but you don't have anything for less than six minutes. Now, that's the system. Now, if you take less than six minutes, then you put down six minutes and, although, it was productive and although it was meaningful, if you don't put it on your time sheet, you've lost that six minutes.

Page 75, line 17 to Page 77, line 5.

\* \* \* \* \* \*

MR. SHULMAN: We've already discussed attendance by attorneys at meetings and the follow up there. Let's talk about policy with respect to participation in trials. Can you actually prepare any substantial litigation using one attorney?

MR. LEBOWITZ: No. No, and I don't think the Court would even suggest that I do that at the rates that I charge. I wouldn't do the research, I wouldn't do the preparation of the discovery, I wouldn't do a lot of the leg work, I wouldn't do the initial preparation of the pleadings. I come into the case when the case is pretty much prepared and put the whole thing together in a cohesive fashion. And at the trial, I think it would be foolhardy to have a trial on a complex issue with nobody there but one lawyer, nobody taking notes of the testimony, nobody there to argue the law, nobody there to slip messages of questions or areas you didn't cover with the witness. I think that would be ill-representation.

MR. SHULMAN: Is this used, based on your experience in the other departments in Frank, Bernstein and in other law firms?

MR. LEBOWITZ: Based on my experience of 35 years of litigation.

MR. SHULMAN: Is it your experience based on 35 years of litigation that when more than one attorney participated in that fashion at a hearing that the time is charged for both attorneys?

MR. LEBOWITZ: Yes.

JUDGE SCHNEIDER: Let me ask this since you've mentioned the 35 years experience part of this answer. Has this always been the case even 35 years ago?

MR. LEBOWITZ: Always. When I started to practice, I was with the firm of Hoffberger & Hollander, and I handled the litigation in general practice, mostly real estate. That merged with Gordon, Feinblatt & Rothman in, I think it was 1963, and I continued to handle all the real estate litigation. As a matter of fact, Mr. Coppel was one of my associates. And Mr. Coppel was always my second chair. Then, we got involved with the Joel Kline bankruptcy case and we got involved in—and I got involved in bankruptcy about 20 years ago. But there is no difference in our litigation department we've got teams, and I've seen as many as five in a case doing various, discrete parts of the case, and at least two

in court. I don't mean that to be the—without any qualification. If it's a simple matter, a simple motion that's being argued, or if it's a routine thing, or something that's not of any great significance, sure, one attorney should go. To have two attorneys there I think is ill-advised.

But, Your Honor, I think that the Court has to—it's like second-guessing. It's like being a Monday morning quarterback. I think the Court has to understand that someone who has been doing this for a long period of time ought to know how to staff a case and run a case in the most efficient and economical way possible. It's not just bankruptcy clients you deal with; it's non-bankruptcy clients you deal with. You don't do anything differently here than you do there. It's the same.

JUDGE SCHNEIDER: I might agree with you in this case if you were counsel to the debtor and there were a number of issues that the debtor had to cover just by nature of the variety of the things that a Chapter 11 debtor in possession encounters. But in this case, you were counsel to the Creditors' Committee, and yet, you have a staff of so many different people doing so many different things. Why was this necessary?

MR. LEBOWITZ: Well, I think you better—we better go on with the testimony. You know—

JUDGE SCHNEIDER: Because this is different. If in the event there is a court reviewing a transcript of this hearing, I think this is a vital part of your case, and certainly it's a vital part of any decision that I come to as to what is the difference with respect to what this Creditors' Committee was doing.

MR. LEBOWITZ: All right.

JUDGE SCHNEIDER: In terms of a Chapter 11, I look at this case as one where the Creditors' Committee was watching what the debtor did and making sure that the debtor didn't do anything illegal—

MR. LEBOWITZ: Oh, no.

JUDGE SCHNEIDER: —or against the interests of the members of the Creditors'

Committee. And my question is really, why did you have to have so many people doing this—

MR. LEBOWITZ: All right. I'll—

JUDGE SCHNEIDER: —and more specifically, and I guess as a second part of that, why was it necessary for you to be making all the telephone calls, and doing that kind of work that I think could have been delegated to somebody junior to you who—

MR. LEBOWITZ: Your Honor, it doesn't—

JUDGE SCHNEIDER: —was earning—let me finish the sentence—

MR. LEBOWITZ: All right.

JUDGE SCHNEIDER: —who was earning a fee at a rate lower than yours?

MR. LEBOWITZ: All right. Then—

JUDGE SCHNEIDER: And then report back to you by memo which would be a lot shorter for you to read than to conduct the call yourself.

MR. LEBOWITZ: Then, Your Honor, the problem is that you always see what goes on in the courtroom and the Code specifically provides that you're not to get involved in the administration of an estate, and I think in what we're doing today, the Court's going to get involved far more than the Court ought to get involved because we've got some confidential information, some attorney/client information here that ordinarily the Court would not see. The reason—first of all, there are not an extraordinary number of people involved in this case. Everybody had a specific function. There was a disclosure statement, there was a confirmation hearing, there was discovery, there was research that had to be done. To put a committee on a different footing than the debtor and make it play on an uneven playing field is a total disservice to a very significant part of any Chapter 11 case. And it takes away the watchdog role of the committee. The committee in this case didn't just sit there and review papers. This was a very active committee that did a major benefit for the creditor body by doing what it did, and instructing me to take whatever action

they thought was justified under the circumstances.

To use paralegals the way we did in this case, I think the Court's going to find that that was very economical. I didn't keep track of the erosion of the inventory and the erosion of the receivables which was massive. That was done by Kathy McCruden. She kept the flow chart which is, I think, a piece of evidence. I reviewed it. I had to review it to report to the Creditors' Committee.

I don't know how many formal meetings we had in this case, but I would suspect that we must have had six to eight formal meetings a number of which the debtor was invited to. And we must have had another five or six telephonic conference meetings because of their serious concern about what was happening to this debtor.

My function was to review the data that was being put together by the paralegal. My function was not to prepare the discovery. That was prepared by Mr. Guzinski in connection with the motions that were pending. I did not do the research. That was done by an associate. The time that you see here is, in a case that went for this period of time with the animosity that existed in this case and the disputes that arose in this case, I think is not a great deal of time. I think it's a relatively small amount of time with the tasks, I think assigned in the most efficient fashion.

Page 86, line 2 to Page 91, line 15.

\*     \*     \*     \*     \*     \*

MR. SHULMAN: Is it a duty of a Creditors' Committee and the counsel for the Creditors' Committee in an ordinary case to monitor proposed settlements of litigation?

MR. LEBOWITZ: Sure.

MR. SHULMAN: What would happen if that did not occur and cases were improperly settled?

MR. LEBOWITZ: Well, to the extent that it's improperly settled, it's a loss of an asset to the estate. You're dealing with—

MR. SHULMAN: What about with—

MR. LEBOWITZ: You're dealing with assets of the estate.

MR. SHULMAN: What about with respect to the performance of counsel to his client if he does not monitor settlements?

MR. LEBOWITZ: I think he's going to subject himself to a claim of malpractice. And besides that, one of the things they were concerned about was they wanted somebody to oversee the settlement of these cases to make sure that they weren't being given away. Mr. Jed had nothing to lose. But the creditors did because these were their assets.

MR. SHULMAN: Let me also ask this. How can you tell whether a settlement is proper unless it is reviewed?

MR. LEBOWITZ: You can't, and that's why I asked for backup in most cases.

MR. SHULMAN: In representing either a committee or a debtor, does every action that the counsel takes necessarily translate into a specific monetary benefit in taking that action?

MR. LEBOWITZ: No.

MR. SHULMAN: Can you conduct a practice of law by only limiting yourself to those things that actually do immediately translate?

MR. LEBOWITZ: No. First of all, when you undertake it, you don't know whether it will or it won't. But you can't not undertake it because then you're not fulfilling your role as counsel.

JUDGE SCHNEIDER: Well, this is the external problem that we all face in these kinds of cases.

MR. LEBOWITZ: Your Honor—

JUDGE SCHNEIDER: This case could have been a wash and you would have gotten nothing even if you had expended all this time.

MR. LEBOWITZ: And that may be true, but to abdicate the role of counsel for the committee when the committee says—insists that you monitor this, you just don't do that. And if Creditors' Committee counsel does not get paid for doing what he's supposed to do under the Code, being the watchdog, and what his client is insisting

that he do, then I won't represent Creditors' Committees. I mean, it just doesn't make sense.

JUDGE SCHNEIDER: Let me ask this question. I think you said earlier that it was the client's idea not to file the motion for the appointment of the trustee early?

MR. LEBOWITZ: No, it was mine. They wanted to file it.

JUDGE SCHNEIDER: Why was that? You said, I think, on two different occasions the client wanted the motion filed and you didn't do it.

MR. LEBOWITZ: That's right.

JUDGE SCHNEIDER: And my question is, why not? It sounds to me—

MR. LEBOWITZ; Well, the first time—

JUDGE SCHNEIDER: Let me just finish.

MR. LEBOWITZ: The first time—

JUDGE SCHNEIDER: Let me just finish my question. It sounds to me, according to the flow chart, that you would have had the perfect justification for filing the motion early, or even on the second occasion; and yet, you didn't do it, even though the client told you to do it.

MR. LEBOWITZ: In this case, the client didn't insist, but the client said, "Should we file?" And remember, I've got all these other bankruptcy lawyers there, all right? And what was happening was in the very beginning, almost, I think, at the first meeting, they had suggested changing management. At that point in time, we did not have enough experience of the debtor as a debtor in possession to make the judgment, and I did not want to file a motion for the appointment of the trustee at an early stage in the proceeding without giving the debtor some chance before the Court. First of all, I didn't think the Court would grant it at that early stage; and secondly, I didn't think we had enough history behind us.

Page 105, line 19 to Page 108, line 21.

\*    \*    \*    \*    \*    \*

JUDGE SCHNEIDER: So weren't you taking a gamble in not filing the motion for the appointment of the trustee when the client had indicated that it wanted a trustee appointed?

MR. LEBOWITZ: No, no. The client had suggested that. We had had discussions with the committee—the committee was represented by bankruptcy counsel. The sense was not file then.

JUDGE SCHNEIDER: Oh, I see, they said not to.

MR. LEBOWITZ: The sense was. I did not overrule anybody's judgment if that's what the Court is suggesting, all right? It was suggested right along that we ought to think seriously, or contemplate, filing a motion for the appointment of a trustee. Put it off, and I said not now, not now. They took my advice. We've got other bankruptcy counsel who represent members of the committee, and we discussed it at a number of meetings, and the decision was made not to file it then.

Page 110, line 1 to Page 110, line 17.

\*    \*    \*    \*    \*    \*

MR. SHULMAN: In your experience, is it sometimes necessary to litigate over a plan or a trustee in order to get a resolution?

MR. LEBOWITZ: Sometimes it's necessary to litigate to get a resolution of issues that can't be resolved in other way.

MR. SHULMAN: Does litigation sometimes facilitate settlement?

MR. LEBOWITZ: Most often, especially when everybody's feet is to the fire and the day of reckoning is coming and the hearing is coming up, as the Court knows, that's the time when most cases get settled. And when you have people who just will not or cannot negotiate or act reasonably, the only way that you can get this done is to file litigation, and hopefully it gets settled. If it doesn't get settled you move forward with it, and certainly counsel should not be penalized because the case settled because litigation was filed and the case was settled and that litigation did not go forward.

Page 140, line 10 to Page 140, line 17.

\*    \*    \*    \*    \*    \*

MR. MUSGRAVE: I did want to be heard on this just because I've kind of been sitting back and not saying too much throughout this hearing.

Your Honor, I kind of take a very active role in billing and that sort of unpleasant, or those sorts of unpleasant things, at my firm, and I guess you've heard the perspective of Frank, Bernstein, and I'd like to give you the perspective of what I think some of the, perhaps, judges have. I know you know all about the case authority.

For instance, Mr. Lebowitz made the comment that it's impossible to put down an accurate description, or rather, a complete description of the time that is spent on a case because in the press of things, it just doesn't make sense. You'd be spending more time putting your time down on a time sheet as opposed to actually doing the work.

With all due respect to Mr. Lebowitz, I really disagree with that because the only way that I think a bill can possibly be generated that means anything to anyone, be it the Court, be it a client, anyone, is if the description makes sense. The description has got to be complete, it's got to be accurate. Many of the courts talk about a telephone conference with so and so regarding such and such. I mean, that's what, at least the people I deal with, expect. That's what we must do. We can't send a bill that says "conference in the office."

Now there's been a lot of discussion today about conferences in the office. The U.S. Trustee addressed that. The Bar Association addressed conferences in the office. I think the basic point about conferences in the office is that there is so much potential for abuse. I can't tell you the number of times that people have contacted me and said, "You mean to tell me I'm paying for two lawyers talking to each other?" You know, I don't have a problem paying for the drafting of a pleading or a telephone conference, but if two people get together, the problem is there is such potential for abuse.

I'm not going to say that when two attorneys get together and one attorney delegates to another that those attorneys shouldn't be compensated. I will say, however, that because of the circumstance of a conference, that sort of an activity is the type that, in most cases, would be written down. I mean, I can tell you we do it. I would imagine other firms do it. It's just—and I understand why the Court and other judges do not like conferences in the office. Yes, in a large law firm you're going to have people conferring a lot, but it really tends to be excessive at times, and that's what people have to keep in mind.

With respect to the expenses, we didn't really address it today, but the Court did not allow postage, the Court did not allow messenger service, the Court did not allow, I believe, telephone—or long distance telephone calls. I pointed this out in my memorandum and I'll say it again, we bill for that. I think it's everyone's practice in the community to bill for long distance telephone calls, for messenger service that is to points outside of Baltimore, and for extraordinary postage, when you've got large bulk mailings, when people have to stay overtime to do these things. Frankly, it's not our practice to bill for overtime. It's not our practice to bill for meals when people have to stay late. Now, I know that we did include it on our fee application before, but in a vast majority of instances, we do not include that time when we send bills to our regular clients. I mean, they simply won't pay it.

I would hope, and I guess I'm in a sense agreeing with the Bar Association's position, that there would not be a blanket prohibition against the disbursement items such as extraordinary postage, long distance telephone, whatever the other was, because I think that is a regular, normal practice of law firms in this city to assess those items to the individual client.

One thing that I think came out today which maybe was not clear before is that there are many occasions when an associate does work that has to be substantially revised or reviewed by the supervising attorney. I think that was the case here with

respect to Mr. Guzinski. It's clear that he spent a lot of time on this case, 166 hours. It's also clear that a lot of the work that he did had to be substantially revised by either Mr. Shulman or Mr. Lebowitz. And that's very understandable. I mean, I certainly agree with them when they say they want to do a first-rate job. I mean, I want to do a first-rate job; everyone wants to do a first-rate job, but the problem is the time spent by the associate is not really productive time. And I think that would be a classic case where billing judgment should be exercised. If I didn't say this at the hearing before, or if I didn't say it in the memorandum, I certainly agree that billing judgment has to be exercised in every case. And Mr. Lebowitz made it clear that Mr. Guzinski's work was not of the same quality, I think that's what he said, as Ms. Merkle or as Mr. Shulman, and therefore, he spent a little bit more time than perhaps he should have. But I don't think it's right to bill the client for time spent that is not productive, and I think that's what's happening here.

I've already made my point about the motion for the appointment of a trustee, the time spent in connection with the confirmation hearing. Just pardon me for reiterating. I think that the Court was correct in concluding that the motion for the appointment of a trustee filed when it was filed was a litigation tactic designed to force the Leonard Jed Company to accept a plan which was more to the committee's liking. Yes, the Leonard Jed Company did agree to change the terms of the plan and a happy result ensued. That was a plan which could be confirmed by the Court. And indeed, I think this was a successful reorganization. The Leonard Jed Company is still operating, thank God.

Anything else I would say would merely be repeating what I said in the memorandum. I don't want to do that today. I will only close by saying that there is no question these fee application hearings are very distasteful. No one likes his or her fees to be questioned. My only response to that is it's a fact of life these days, and it seems to me that when people appear before the Bankruptcy Court, representing the debtor, representing a creditor, representing a Creditors' Committee, or any other professional, or any other entity, they are going—they have to expect that their fees are going to be examined. And I don't think anyone should have any concern that those fees are going to be challenged if those fees are reasonable, necessary, the result of productive work.

Page 182, line 14 to Page 187, line 7.