In re BERNARD HILL, INC., Debtor.

No. 90–5–1626–JS.

United States Bankruptcy Court,
D. Maryland.

June 28, 1991.
Supplemental Opinion Oct. 29, 1991.

George F. Bason, Jr., Joel R. Kaswell, Fisher, Wayland, Cooper & Leader, Washington, D.C., for debtor-in-possession.

Gary R. Greenblatt, Schwarz & Greenblatt, Baltimore, Md. for Unsecured Creditors Committee.

Arvin E. Rosen, J. Harold Grady, Siskind, Burch, Grady & Rosen, Baltimore, Md.

Edmund A. Goldberg, Office of the U.S. Trustee, Baltimore, Md.

Michael D. Colglazier, Pamela M. Williams, Hogan & Hartson, Baltimore, Md., for First Nat. Bank of Md.

Linda V. Donhauser, Miles & Stockbridge, Brooke Schumm, III, Semmes, Bowen & Semmes, Baltimore, Md., for N.Car. Nat. Bank.

Terry L. Musika, C.W. Amos & Co., Baltimore, Md., Chapter 11 Trustee.

## MEMORANDUM OPINION CONCERNING FEES REQUESTED BY ATTORNEYS AND ACCOUNTANTS

JAMES F. SCHNEIDER, Bankruptcy Judge.

By this opinion, the Court announces the following ten "cardinal rules" applicable to all counsel fee applications filed in the bankruptcy court.

 I. FEE APPLICATIONS MUST MAKE SENSE.

 II. FEE APPLICATIONS MUST INDICATE WHAT WORK WAS PERFORMED, WHEN IT WAS PERFORMED AND HOW MUCH MONEY IS BEING CHARGED FOR PERFORMING IT.

 III. SERVICES RENDERED SHOULD BE REPORTED IN SEVERAL BROAD, GENERAL CATEGORIES.

 IV. FEE APPLICATIONS MUST CONTAIN A "LODESTAR" ANALYSIS.

 V. FEE APPLICATIONS MUST INDICATE HOW MUCH IN TIME AND MONEY WAS "WRITTEN OFF" IN THE EXERCISE OF "BILLING JUDGMENT."

 VI. NUMBERS MUST ADD UP.

VII. THE NAMES OF THE INDIVIDUALS WHO RENDERED SERVICES, TOGETHER WITH THEIR HOURLY RATES AND YEARS OF EXPERIENCE, MUST BE DISCLOSED.

VIII. TIME RECORDS MUST BE SUBMITTED WITH THE FEE APPLICATION.

IX. OUT–OF–POCKET EXPENSES FOR WHICH REIMBURSEMENT IS SOUGHT MUST BE SET FORTH IN THE APPLICATION.

X. WHEN MORE THAN ONE PROFESSIONAL OR FIRM OF PROFESSIONALS IS APPOINTED TO REPRESENT OR FURNISH SIMILAR SERVICES TO A DEBTOR, THE FEE APPLICATION(S) MUST INDICATE A CLEAR DIVISION OF LABOR AND NON–DUPLICATION OF EFFORT.

The foregoing rules also govern the submission of fee applications by accountants, except for rules IV and V.

Based upon the foregoing precepts, this Court will deny with leave to amend the fee applications filed by debtor's counsel and counsel to the unsecured creditors' committee, and will grant the fee application of debtor's accountants.

FINDINGS OF FACT

1. The instant voluntary Chapter 11 case was filed in the United States Bankruptcy Court for the District of Columbia on September 20, 1989.

2. On October 3, 1989, the Court [Teel, B.J.] entered an order [P. 11] authorizing the employment of Joel R. Kaswell, the law firm of Fisher, Wayland, Cooper & Leader and also George Francis Bason, Jr. as counsel to represent the debtor-in-possession under a general retainer.

3. There was no clear division of responsibility between the two counsel appointed to represent the debtor. However, in their "Declaration under penalty of perjury by proposed attorneys" [P. 6], both counsel made the following statement to the bankruptcy court in support of their joint appointment:

There will be no duplication of services or efforts between the law firm of Fisher, Wayland, Cooper & Leader and its partner Joel R. Kaswell, Esq., on the one hand, and George Francis Bason, Jr., Esq., on the other, and their services and efforts will be fully coordinated and complementary.

*Id.,* paragraph 6.

4. Also on October 3, 1989, the accounting firm of Rosen, Sapperstein & Friedlander was authorized by order [P. 12] to render accounting services to the debtor-in-possession.

5. On December 21, 1989, the Court [Teel, B.J.] approved the employment of Gary R. Greenblatt and the law firm of Schwarz, Greenblatt & Rafferty as counsel to the unsecured creditors' committee [P. 116].

6. On January 11, 1990, the accounting firm of C.W. Amos & Co. was authorized to serve as the accountants to the unsecured creditors' committee [P. 137].

7. On April 9, 1990, Judge S. Martin Teel, Jr. signed an order [P. 195] granting the motion of the creditors'. committee for change of venue and transferring the bankruptcy case to this Court.

8. The debtor's background and the history of this case were set forth in the disclosure statement filed by the debtor on July 20, 1990 [P. 243], excerpted as follows:

*Background and Nature of Business*

The Bernard Hill Corporation, t/a "Bernard Hill," opened its flagship store in Baltimore's Hopkins Plaza in 1977 and its Washington Square store in downtown Washington, D.C. in 1983. Over a 13–year period, these two stores have established Bernard Hill as a premier men's retail clothier in the Baltimore–Washington area. Bernard Hill has built its reputation through the sale of the highest quality men's furnishings, especially imported dress suits, shirts and ties, from exclusive European designers,

as well as an unmatched level of personal service . . .

Since its inception, The Bernard hill Corporation has been led by its president, Hillel Greenstein. Mr. Greenstein has some 30 years of experience as a retail clothier both in America and abroad. His expertise in selecting rising fashions and his special rapport with customers are two major reasons for Bernard Hill's strong position in its traditional market area. Mr. Peter French, who also has some 30 years of experience as a retail clothier both here and abroad, is the vice president of the corporation and specializes in marketing strategy. Mr. French's eye for detail and understanding of quiet elegance have undoubtedly contributed to Bernard Hill's image. These two men lead a close-knit team of employees whose concern for and dedication to the customer have become synonymous with the Bernard Hill name.

### Events Leading to Bernard Hill's Chapter 11 Filing

There were several significant events which precipitated the filing of the Chapter 11 voluntary petition by Bernard Hill. Undoubtedly, the principal problems were the Company's rapid expansion in the span of eight months into two relatively unfamiliar markets in New York City and Philadelphia and the commensurate commitment of management's time and the Company's financial resources necessary to establish these stores in highly competitive markets, including hiring and supervising staff, buying for and supplying these stores and initiating advertising campaigns.

The New York store, which opened in April, 1985, was situated in Rockefeller Center; this location, although offering high visibility and prestige, was extremely expensive retail space. Even though the store was beautifully decorated, well-stocked and introduced with an aggressive advertising campaign, the store never seemed to become well established. Several factors were involved; in particular, the preponderance of high-fashion men's boutiques and direct outlets of European designer houses in proximity to the Rockefeller Center location placed the store in an environment of fierce competition, which proved impossible for Bernard Hill, as "new man on the block," to break into.

The Philadelphia location, although a prime downtown area on Walnut Street, never generated a steady clientele. Winter and summer sales were always successful, but a consistent, profitable trade never developed . . .

Although a variety of marketing strategies and product lines was attempted, these two stores never became strong profit centers. Bernard Hill's management and staff worked diligently and determinedly in an effort to find the right combination of product and price, yet the uphill struggle never seemed to end. Bernard Hill's experiences in New York and Philadelphia reinforce the importance of location for a retailer, especially since, during this same period, the Baltimore and Washington stores remained excellent performers with substantially the same marketing strategy and inventory then being utilized in New York and Philadelphia.

The final and determinative factor in Bernard Hill's financial decline was the decision to open Bernard Hill's fifth store—its second in Washington, D.C. This store opened in October 1988 in an upscale mall known as Georgetown Park. From the outset, this store was an administrative nightmare, involving numerous disputes with the landlord over such issues as the type of lightbulb used in recessed fixtures and the claim that the entrance threshold extended slightly into the hallway. The relationship between the landlord and Bernard Hill deteriorated further with the Company's realization, albeit late, that few serious customers traveled through this Mall, the majority being browsing tourists, resulting in minimal sales revenue.

Eventually, with perceived grievances accumulating on both sides, in June 1989 the landlord issued notice of termination of the lease and attempted to accelerate

all rent due thereunder, including a $250,000 loan from the landlord. Soon thereafter, this burgeoning dispute evolved into bitter litigation in the District of Columbia Landlord and Tenant Court with the potential for an enormous judgment against Bernard Hill.

Unfortunately, when the Georgetown Park scenario was unfolding in the summer and fall of 1989, the New York and Philadelphia stores were still showing sluggish sales. To exacerbate matters, Bernard Hill's principal lender, The First National Bank of Maryland, was beginning to feel increasingly insecure and required the Company to build up its commercial checking account.

During this entire period, in an effort to avoid having to file for Chapter 11 bankruptcy relief, Bernard Hill's management and counsel engaged in intense and extended negotiations not only with the Bank but also with the lessors of the New York, Philadelphia and Georgetown Park premises. The negotiations with the New York lessor were successful and resulted in surrender of the New York leasehold on extremely favorable terms effective at the end of August 1989.

However, the negotiations with the First National Bank and the Philadelphia and Georgetown Park lessors did not lead to any mutually satisfactory agreements. In these circumstances, Bernard Hill's management decided, after careful analysis, that a reorganization through a Chapter 11 proceeding would be a timely and intelligent alternative, providing a period of respite and the ability to eliminate the two remaining burdensome leaseholds. Furthermore, the period of reorganization could be used as an instrument by Bernard Hill's management to reassess the Company's position in the marketplace, determine its weaknesses and strengths, consolidate around those strengths, and then reemerge as a viable and competitive business enterprise. Bernard Hill commenced this strategy by filing its voluntary petition under Chapter 11 of the United States Bankruptcy Code on September 20, 1989.

## Significant Events During the Pendency of the Chapter 11 Proceedings

The most notable event and accomplishment during the pendency of Chapter 11 case has been the ability of Bernard Hill's management to implement efficiently its critical strategy of reassessment and consolidation. The numbers speak for themselves: two of four stores have been eliminated, leaving only the flagship store in Baltimore and the Washington Square store in Washington, D.C.; the total number of employees has been reduced from 75 to roughly 30; the monthly operating expenses for all stores and the head office have been slashed from approximately $410,000 prior to the filing to $199,688 for May 1990. In addition, since the first of the year [1990], both the Baltimore and Washington stores have been producing excellent cash flow even though the retail clothing sales climate has been harsh.

Other significant events during the pendency of the Chapter 11 case include:

Within three months of the filing of the petition, the landlords for Bernard Hill's prime locations in Hopkins Plaza [Baltimore] and Washington Square consented to the assumption of these unexpired leases by the Debtor; all arrearages were cured and the Bankruptcy Court approved the assumption of these leases; and Bernard Hill thus will be able to continue to occupy these leaseholds through at least their current expiration dates in 1997 and 1998 and therefore through the entire pay-out period of the attached Plan.

By October 29, 1989, Bernard Hill had surrendered the Georgetown Park leasehold. As of November 19, 1989, the Philadelphia leasehold was "deemed rejected" and surrendered to the landlord. Before closing the doors to the Philadelphia store, Bernard Hill had a spectacular sale which grossed approximately $640,000 over a two-week period, resulting in net income after expenses of $364,000. This cash was essential for the purchase over-

seas of Bernard Hill's spring and fall 1990 inventory.

In December, the Bankruptcy Court authorized Bernard Hill to enter into letter-of-credit transactions for the purchase of inventory from foreign suppliers in an amount not to exceed $350,000. Permission to enter these transactions was essential for Bernard Hill to replenish its inventory after its post-Christmas sale and to purchase its spring and fall 1990 fashions. Following the entry of the Court's order, Mr. Greenstein made several successful buying trips to Europe; almost all major suppliers in Italy, England and West Germany continue to trade with Bernard Hill and have been supportive of its reorganization efforts.

Similarly, in June 1990, after transfer of the case from Washington, D.C. to the U.S. Bankruptcy Court for the District of Maryland, the latter authorized Bernard Hill to enter into letter-of-credit transactions for the purchase of additional inventory from foreign suppliers up to $250,000, for the fall and winter 1990 season.

Finally, considerable efforts have been expended by Bernard Hill's management and counsel (a) to arrange for debtor-in-possession and post-confirmation financing and (b) to formulate a Plan of Reorganization that will achieve the support and endorsement of the Official Committee of Unsecured Creditors. After lengthy and intensive negotiations, both objectives have now been achieved.

(a) Equitable Bank, N.A. of Baltimore, Maryland issued a letter of intent on May 10, 1990, to extend to Bernard Hill a $350,000 demand discretionary line of credit, secured by inventory, receivables and other collateral.

(b) The Official Committee of Unsecured Creditors voted unanimously on June 27, 1990 to support and endorse in principle the Second Amended Plan of Reorganization, subject to any technical amendments that may become necessary in the opinion of the Committee, as being in the best interest of all creditors.

*Means of Funding the Plan; Reorganization Analysis*

The Plan will be funded through several means:

(i) Cash and receivables on hand on the Effective Date;

(ii) Proceeds of the $350,000 loan from Equitable Bank;

(iii) New, fresh capital contributions in the form of purchases of the new common stock of the reorganized Bernard Hill corporation as follows:

(a) $47,000 of common stock to be purchased by Hillel and Hazel Greenstein (Bernard Hill's president and his wife); and

(b) Approximately $300,000 of common stock to be purchased by the trustees of the Bernard Hill Employee Stock Option Plan ("ESOP"), which is to be established on or before the Effective Date and which is expected to be successor in interest to most of the assets of the existing Bernard Hill Pension Plan; and

(iv) Future earnings of the reorganized Bernard Hill corporation over the next seven years.

Disclosure statement, [P. 243], filed July 20, 1990.

9. On May 14, 1990, George Francis Bason, Jr. filed his first application for interim compensation [P. 203] as counsel to the debtor-in-possession in the net amount of $40,712.54 and for reimbursement of expenses in the amount of $350.85 for the period from September 20, 1989 through February 28, 1990.

10. On May 9, 1990, Joel R. Kaswell and the law firm of Fisher, Wayland, Cooper & Leader filed their first application for interim compensation [P. 207] as counsel to the debtor-in-possession in the amount of $125,895.00 and for reimbursement of expenses in the amount of $6,292.49 for the period from September 20, 1989 through February 28, 1990.

11. On May 29, 1990, objections were filed against Mr. Bason's fee application by the U.S. Trustee [P. 210], Coldwell Banker Commercial Group, Inc. [P. 211] and the creditors' committee and First National Bank of Maryland [P. 212] and against Mr.

Kaswell's firm's fee application by the unsecured creditors' committee and First National Bank of Maryland [P. 213].

12. On June 7, 1990, Schwarz and Greenblatt filed a first application for interim compensation [P. 223] as counsel to the unsecured creditors' committee in the amount of $12,306 and reimbursement of expenses in the amount of $233.

13. On June 12, 1990, C.W. Amos & Co. filed an application for compensation as creditors' committee accountant in the amount of $23,486.80 and reimbursement of expenses in the amount of $118.09. By order [P. 245] entered on July 31, 1990, the application was allowed.

14. On October 5, 1990, this Court entered a consent order [P. 268] which partially granted the fee applications filed by debtor's attorneys, as follows:

ORDERED, that Joel R. Kaswell and the law firm of Fisher, Wayland, Cooper and Leader are awarded at this time the interim sum of $122,500, minus the initial retainer of $22,500 paid one year ago, on September 20, 1989, for a net interim award at this time to them of $100,000, and George Francis Bason, Jr. is awarded at this time the interim sum of $35,000 (it appearing that, as set forth in ¶ 7 of his fee application, the $12,500 initial retainer received by him one year ago has already been deducted by him in arriving at the net balance sought in his fee application), of which $10,000 is already held in escrow, leaving a net amount payable from the estate at this time to him of $25,000,

AS INTERIM ALLOWANCES on their respective attorney fee applications for the period from September 20, 1989 through February 28, 1990,

WITHOUT PREJUDICE to their right hereafter to seek the entire balances of the fees requested in their instant applications, together with such additional sums for later periods as they may hereafter seek through subsequent applications; WITHOUT PREJUDICE to the rights of counsel for the Creditors' Committee, the First National Bank of Maryland, Coldwell Banker Commercial Group, Inc. and the U.S. Trustee to renew their previously filed objections to these attorneys' instant applications; ON THE UNDERSTANDING that the Court will give full consideration to those objections at any time that the Court hereafter considers the instant fee applications, without any need for renewal of the objections; and WITHOUT PREJUDICE to the rights of all parties in interest to object to any fee applications that may hereafter be filed in this case; and it is further

ORDERED, that Joel R. Kaswell and the firm of Fisher, Wayland, Cooper and Leader are awarded the sum of $6,292.49 and George Francis Bason, Jr. is awarded the sum of $350.85 as reimbursement for expenses incurred and paid during the period from September 20, 1989 through February 28, 1990; and it is further

ORDERED that the Debtor is authorized and directed to pay to Joel R. Kaswell and the firm of Fisher, Wayland, Cooper and Leader and to George Francis Bason, Jr. the said sums for fees and for expenses within twenty (20) days after entry of this Order.

/s/ James F. Schneider
U.S. Bankruptcy Judge

Order [P. 268] dated October 5, 1990.

15. On October 12, 1990, Rosen, Sapperstein & Friedlander filed an application for interim compensation [P. 271] for services rendered as debtor's accountant in the amount of $87,820 and for reimbursement of expenses in the amount of $312.99, covering the period from September 21, 1989 through September 23, 1990. The requested fee was later changed by amendment [P. 293] filed December 5, 1990 to $82,211.25 and the request for expenses was increased to $426.74.

16. On September 27, 1990, Schwarz & Greenblatt filed a second application for interim compensation [P. 266], as counsel to the unsecured creditors' committee, in the amount of $8,895 and for reimbursement of expenses in the amount of $291, for the period from March 1, 1990 through September 15, 1990.

17. On October 29, 1990, this Court ordered that a Chapter 11 trustee be appointed, upon motion of the unsecured creditors' committee and by consent of the debtor-in-possession [P. 279]. The following day, Terry L. Musika was appointed Chapter 11 trustee by the office of the United States Trustee [P. 286] and was ordered to post a bond in the amount of $2,000,000.

18. Meanwhile, on October 29, 1990, Fisher, Wayland, Cooper & Leader filed a second and final application [P. 280] as debtor's counsel in the amount of $126,307.31 and for reimbursement of expenses in the amount of $10,939.51 for the period from March 1, 1990 through November 13, 1990.

19. On the same day, October 29, 1990, George Francis Bason, Jr., filed a second and final application for compensation [P. 281] as debtor's counsel in the amount of $72,517.50 and for reimbursement of expenses in the amount of $438.60 for the period from March 1, 1990 through November 13, 1990.

20. Objections were filed to the application of Rosen by First National Bank and North Carolina National Bank [P. 290] on November 21, 1990 and by First National, North Carolina National and the unsecured creditors' committee [P. 301] on December 20, 1990.

21. On December 19, 1990, First National Bank, North Carolina National Bank and the creditor's committee filed objections [PP. 299 and 300] to the final applications of Fisher, Wayland and Mr. Bason, respectively.

22. On February 25, 1991, Schwarz and Greenblatt filed its third interim application [P. 309] for compensation as counsel to the unsecured creditors' committee in the amount of $12,706 and for reimbursement of expenses in the amount of $446.50, for the period from September 16, 1990 through February 15, 1991.

23. On March 4, 1991, Fisher, Wayland filed an amended fee application [P. 311] by which it reduced its requested compensation from $126,307.31 to $47,500 and increased its requested reimbursement of expenses from $10,939.51 to $11,091.40.

24. On March 8, 1991, Rosen filed an amended fee application [P. 313] by which it reduced its requested compensation from $82,211.25 to $70,000 and abandoned its request for reimbursement of expenses.

25. The various contested and uncontested fee applications came on for hearing in open court on March 21, 1990, at which time the unsecured creditors' committee and North Carolina National Bank withdrew their objections to the fee applications of Rosen, Sapperstein & Friedlander and endorsed the reduced fee application of Fisher, Wayland. However, First National Bank reaffirmed its objections to the reduced fee applications of Rosen and Fisher, Wayland. The objectors renewed their objections to the application of Mr. Bason, who reduced his requested fee from $72,517.50 to $62,790.50.

26. At the hearing, Mr. Kaswell indicated that it became apparent in November, 1990 that the debtor's plan was not feasible due to the withdrawal of the debtor-in-possession financing proposal by Maryland National Bank. According to Mr. Kaswell, the Chapter 11 trustee was appointed while sufficient votes to approve the plan were being received.

27. Nature of Objections

A. As to fee request of Mr. Bason:

The objectors alleged that Mr. Bason spent excessive amounts of time for services rendered on a case with limited resources, there was duplication of effort between Mr. Bason and co-counsel, Fisher, Wayland, and the results obtained do not justify the requested fee.

B. As to fee request of Fisher, Wayland:

The same objections made to Mr. Bason's fee were made to the Fisher, Wayland fee request, with the additional charge that Fisher, Wayland failed to delegate routine tasks to paralegals and clerical personnel.

C. As to fee request of Rosen, Sapperstein & Friedlander:

First National renewed its objection to the fee on the grounds that the fee applica-

tion was too general and that the time charged was excessive.

28. The applicants in turn charged First National Bank with having unreasonably opposed the debtor's efforts to reorganize and alleged that the Bank caused counsel to expend a great deal of their time defending the Bank's attacks on the debtor.

## CONCLUSIONS OF LAW

1. The award of compensation to professional persons who render services to a bankruptcy estate is a "core proceeding" arising under title 11 of the United States Code which bankruptcy judges may hear and determine. 28 U.S.C. § 157(b)(1), (b)(2)(A), (B) and (O) (1988).

2. Compensation to attorneys and other professional persons employed by a debtor or debtor's estate is governed by Sections 328(a), (c), 330(a) and 331 of the Bankruptcy Code.[1]

3. The determination of what is reasonable compensation for actual, necessary expenses for purposes of reimbursement is within the sound discretion of the bankruptcy court. *In re AOV Industries, Inc.*, 43 B.R. 468 (D.D.C.1984).

4. The burden of proof that services were actual and necessary and that the compensation requested is reasonable always rests upon the applicant who seeks the payment of professional fees from a bankruptcy estate, regardless of whether an objection has been filed. *See In re Metro Transportation Co.*, 78 B.R. 416, 420 (Bankr.E.D.Pa.1987); *In re Pettibone Corp.*, 74 B.R. 293 (Bankr.N.D.Ill.1987).

5. "Lodestar" principles guide the Federal courts in this circuit in considering applications for compensation by attorneys. *See Barber v. Kimbrell's Inc.*, 577 F.2d 216 (4th Cir.1978), *cert. denied*, 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978), applying criteria originally set forth in the leading case of *Johnson v. Georgia Highway*

---

**1.** § 328. Limitation on compensation of professional persons.

(a) The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

. . . . .

(c) Except as provided in section 327(c), 327(e), or 1107(b) of this title, the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title, if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328(a), (c) (1988).

§ 330. Compensation of officers.

(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney ——

(1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based upon the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1), (2) (1988).

§ 331. Interim compensation.

A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date of such an application or reimbursement for expenses incurred before such date as is provided under section 330 of this title. After notice and a hearing, the court may allow and disburse to such applicant such compensation or reimbursement.

11 U.S.C. § 331 (1988).

*Express, Inc.,* 488 F.2d 714 (5th Cir.1974). The *Johnson* criteria are:

1. The time and labor required.

2. The novelty and difficulty of the questions.

3. The skill requisite to perform the legal services properly.

4. The preclusion of other employment by the attorney due to the acceptance of the case.

5. The customary fee.

6. Whether the fee is fixed or contingent.

7. Time limitations imposed by the client or the circumstances.

8. The amount involved and the results obtained.

9. The experience, reputation and ability of the attorneys.

10. The "undesirability" of the case.

11. The nature and length of the professional relationship with the client.

12. Awards in similar cases.

*Id.,* at 717–19.

In the case of *Anderson v. Morris,* 658 F.2d 246 (4th Cir.1981), the Fourth Circuit Court of Appeals further explained the application of lodestar principles by endorsing two later Fifth Circuit cases decided after *Johnson* which held that courts reviewing fee applications should

> ... [A]scertain the nature and extent of the services supplied by the attorney from a statement showing the number of hours worked and an explanation of how these hours were spent. The court should next determine the customary hourly rate of compensation. These are essentially *Johnson* factors 1 and 5. The court should then multiply the number of hours reasonably expended by the customary hourly rate to determine an initial amount for the fee award. Finally, the court should adjust the fee on the basis of the other factors, briefly explaining how they affected the award. *In re First Colonial Corp. of America,* 544 F.2d 1291, 1298–1300 (5th Cir.1977). *See also Copper Liquor, Inc. v. Adolph*

*Coors, Co.,* 624 F.2d 575, 581–84 (5th Cir.1980).

*Id.* at 249.

In *Harman v. Levin,* 772 F.2d 1150 (4th Cir.1985), the court held that the 12 *Johnson* factors are applicable to the determination of proper awards of counsel fees in bankruptcy cases.

6. In the case of *In re Leonard Jed,* 103 B.R. 706 (Bankr.D.Md.1989) ["*Jed I*"], modified 118 B.R. 339 (Bankr.D.Md.1990) ["*Jed II*"], this Court held that a fee application filed by counsel to a creditors' committee was insufficient because it did not indicate the time spent performing various categories of services; that compensable "out-of-pocket expenses" include "heavy" postage, long-distance telephone calls and messenger services, but do not include secretarial overtime or meals; and that the failure to exercise "billing judgment" by writing off excessive office conferences and unnecessary duplication of effort will result in the reduction of fees when they are unreasonable in the sound discretion of the Court.

7. Because this Court is required to determine a proper counsel fee to be awarded based upon a "lodestar" analysis, it follows that the petitioning attorney should also be required to justify the requested fee according to the same analysis. This demands thoughtful preparation on the part of the lawyer, because the very antithesis of a lodestar analysis is compensation based strictly upon hours times rates.

DEBTOR'S ATTORNEYS

 8. Although it has been asserted that the reason this debtor required the services of both Mr. Bason and the Fisher, Wayland firm was because the law firm is experienced in corporation law and Mr. Bason is a recognized bankruptcy expert, it is apparent to the Court that each performed services in the other's area of expertise. The Court has found extensive evidence of duplication of effort on the face of the fee applications filed by both counsel. In some instances, the identical descriptions of work performed appear in both applications. In still other situations, the language of each

application is only slightly varied from that of the other.

In areas where two attorneys are doing the work of one, it is appropriate to question what benefit the debtor and its estate received by having this kind of double representation.

9. The two fee applications [PP. 207 and 280] filed by Fisher, Wayland are legally deficient for several reasons. First, it is impossible to read them and know immediately how much time the law firm spent performing each of the various services indicated and what it charged for them. This is because the applications list various members of the firm and the time each of them spent on any given task, without totalling the numbers of hours or the charges. One must have a calculator in order to total up the hours, then multiply by the individual's hourly rates to determine whether the law firm charged a reasonable fee.[2] It was necessary to review both fee applications to determine whether Fisher, Wayland exercised sufficient billing judgment in writing down $78,607.50 from its second fee application to account, among other things, for duplication of services performed by Mr. Bason.

10. The second application is 26 pages in length and sets forth 24 separate services performed (a through x). The first application [P. 207] is 45 pages in length and sets forth 124 separate services performed! The categories of services should have been fewer in number and more general in nature, rather than presenting such minutia as "preparing a motion pro hac vice" that consumed one hour [task no. 124]. These applications are padded with routine services. A court should not have to "wade through" this kind of trivia in order to award a fee.

MR. BASON'S FEE

11. Compared to the ordeal of reviewing the fee applications of Fisher, Wayland, it was a delight to review Mr. Bason's fee applications (if such employment can ever be characterized as "delightful"). This was principally because Mr. Bason grouped his services into a smaller number of categories and because, being a sole practitioner, he was the only member of his firm who performed services, and then at a fixed rate. Unfortunately, the calculations of time and charges set forth in Mr. Bason's second fee application does not match the totals set forth in his time sheets.[3] This

---

**2.** A typical entry in the second application follows:

> e. *Disclosure Statements for First and Second Plans.* Counsel, with the assistance of co-counsel Bason, expended a significant amount of time drafting and preparing the Debtor's Disclosure Statement for both the First and Second Amended Plans of Reorganization and the several subsequent modifications thereto. These Disclosure Statements were crucial documents for the Debtor's reorganization efforts and confirmation of the Plan. Counsel drafted the Disclosure Statement to provide the essential information necessary for the hypothetical, reasonable creditor to make an informed judgment on the plan. The Statement included sections on the history of The Bernard Hill Corporation, the events precipitating the Chapter 11 filing, significant events occurring during the pendency of the Chapter 11, the mechanism for funding the plan, post-confirmation management of the business and finally a discussion of the proposed treatment and classes of creditors.

JRK: 29.50 CM: .50 RAP: 14.75

AD: 30.25 BHG: 6.75

Fisher, Wayland Second Application [P. 280] p. 9. One must refer to the first fee application to

decipher the initials of the firm members who worked on the case and identify them. In so doing, one learns that JRK is Joel R. Kaswell and BHG is Barry H. Gottfried, both partners with hourly rates of $185 and $175, respectively; ADZ is A. David Zaltas, an associate whose hourly rate was $120; CM is Christine Moldenhauer and RAP is Richard A. Pursley, legal assistants whose hourly rates were $70 and $75, respectively. Multiplying hourly rates by numbers of hours and adding up the results indicated that Fisher, Wayland spent a total of 81.75 hours and charged $11,410 to assist Mr. Bason in the drafting and preparation of disclosure statements, for which Mr. Bason charged $5,828. (What possible reason existed for both Mr. Bason and the Fisher, Wayland firm to spend a total of 108.35 hours drafting disclosure statements is not disclosed.) Mr. Bason is the bankruptcy expert. Fisher, Wayland is the corporate counsel. This was merely one example of duplication of services evident from an examination of the fee applications of Mr. Bason and the law firm.

**3.** Mr. Bason's time sheets indicate 297.3 hours expended for a fee requested of $64,883.50. His fee application requests a fee of $72,517.50, but itemized services total 260.5 hours for a fee in

defect alone would be fatal, but there are other problems as well.

12. Mr. Bason's fee applications and those of Fisher, Wayland fail to explain how labor was divided between the lawyers and indicate a great deal of duplication of effort. Out of the second Fisher, Wayland fee application which requested $126,-107.50, (which the firm drastically reduced by $78,607.50 to $47,500), the Court finds evidence of duplication in an amount greater than the reduction. In fact, the Court estimates the amount which could be disallowed as duplicative to be approximately $90,000. However, it would not be fair to do so without giving Fisher, Wayland the opportunity to defend its position. Likewise, it occurs to the Court that merely because Fisher, Wayland performed services that Mr. Bason was more qualified to render is no reason to reduce Fisher, Wayland's fee, unless the services were duplicative. Assuming they were duplicative, what basis is there to reduce only the fee of Fisher, Wayland and not the fee of Mr. Bason as well?

13. Under the lodestar approach, the first step in arriving at a reasonable counsel fee is the computation of a base fee obtained by multiplying the attorney's customary hourly rate times the number of reasonable hours expended. The Court is unable to determine a reasonable number of hours expended because of the problems inherent in the fee applications of both debtor's counsel. None of the applications sets forth a meaningful lodestar analysis.

14. In this case, where two separate counsel were appointed as general bankruptcy counsel to represent the debtor-in-possession, this Court will require them to submit a joint fee application which delineates a division of labor, a write-off of duplication and the exercise of billing judgment. As matters now stand, this Court is unable to award either counsel a proper fee based upon anything other than an arbitrary reduction. Accordingly, the fee applications of Fisher, Wayland and George Bason will be denied with leave to file such a joint application within 60 days hereof.

the amount of $56,996.90. The Court is unable

## CREDITORS' COMMITTEE COUNSEL

15. Mr. Greenblatt stated at the hearing that the creditors' committee had negotiated a reduction in the fees sought by Fisher, Wayland and Rosen, Sapperstein based upon the lack of favorable results obtained in the case, and recommended that the same reduction be applied to Mr. Bason's fee. Under the circumstances, is it only fair to reduce Mr. Greenblatt's fee by the same percentage? The answer depends upon whether the firm of Schwarz and Greenblatt already exercised billing judgment and whether it has performed a sufficient lodestar analysis. Unfortunately, the three fee applications filed by the firm make no mention of lodestars or billing judgment. Under the circumstances, the Court will deny the Schwarz and Greenblatt fee applications with leave to file a final amended fee application in 60 days which addresses these concerns.

## DEBTOR'S ACCOUNTANTS

16. The Court will overrule the objection of First National Bank to the fee application of Rosen, Sapperstein & Friedlander and allow the debtor's accountants a fee in the requested amount of $70,000, based upon the following analysis. First, this Court has never required that a fee application filed by an accountant comply with the same technical standards as an application filed by an attorney. In this regard, the Court holds that while an accountant's fee application must contain an itemization of services rendered and the corresponding hours and charges for such services, supported by time records, the application itself need not set forth a lodestar analysis in order to be approved. The application filed by the accounting firm in this case was sufficiently detailed to enable the Court to determine that the services rendered were actual and necessary. Second, because the accountants rendered these services at the debtor's request through counsel, pursuant to an order of court approving the accountant's employment, and because such services appeared to have been "reasonable and necessary"

to determine the reason for the discrepancies.

at the time, the accountants were obliged to render these services without questioning the debtor's judgment in demanding them and with the assurance that the firm would ultimately be paid for performing them. Such right to payment of a professional engaged by a debtor through counsel may not be present in each and every case, but under the particular facts of this case, the debtor's accountants have a right to payment. Finally, under the circumstances, the Court finds the services rendered by the accounting firm to have been actual and necessary and the requested compensation therefor, (which the firm voluntarily reduced significantly from $82,211.25 to $70,000) to be reasonable.

ORDERS ACCORDINGLY.

SUPPLEMENTAL MEMORANDUM OPINION AWARDING FEES AND EXPENSES TO COUNSEL TO THE DEBTOR AND CREDITORS' COMMITTEE

Counsel to the debtor and the creditors' committee have responded to this Court's opinion of June 28, 1991 by filing supplemental fee applications. Based upon those fee applications, the Court will award compensation to the debtor's attorneys and the creditors' committee's attorneys in the following amounts:

| DEBTOR'S ATTORNEYS | — | $250,559.55 |
|---|---|---|
| Fisher, Wayland, Cooper & Leader | — | $161,266.50 |
| George Francis Bason, Jr. | — | $ 89,293.05 |
| CREDITORS' COMMITTEE COUNSEL | | |
| Schwarz & Greenblatt | — | $ 34,877.50 |

As required by this Court in its earlier opinion, the debtor's attorneys filed a revised joint fee application on August 27, 1991, combining the hours and services of Mr. Bason and the law firm of Fisher, Wayland, Cooper & Leader in one document.

The joint application is a vast improvement over the earlier product submitted by the law firm in terms of clarity, brevity and logical organization. The joint application also includes a detailed lodestar analysis and the explanation of counsel's exercise of billing judgment.

However, the joint application fails to delineate any meaningful division of labor between Mr. Bason and the law firm. In lieu of such a delineation, the application puts forth the rather novel proposition that Mr. Bason has been "of counsel" to the Fisher, Wayland firm. According to *Black's Law Dictionary* (5th ed.1979), the term "of counsel" is

a phrase commonly applied in practice to the counsel employed by a party in a cause, and particularly to one employed to assist in the preparation or management of an action, or its presentation on appeal, but who is not the principal attorney of record for the party.

*Id.* Neither the order which appointed counsel nor the applications which sought their appointment support the proposition that Mr. Bason's role in this case was to be that as "of counsel." He was lead bankruptcy counsel in reality. Because the applicants have failed to carry their burden of showing a satisfactory division of labor, the Court has exercised its discretion to further reduce the requested fee to address what it perceives to be substantial duplication of effort. Because Mr. Bason was lead counsel, the Court will reduce the fee attributable to work performed by the firm. The joint fee application requested total compensation in the amount of $273,059.55 based upon a lodestar figure of $303,399.50. By exercising billing judgment on behalf of the law firm, this Court reduced the lodestar by $25,000, which yielded a modified lodestar in the amount of $278,399.50. Using counsel's own figures, the Court reduced the modified lodestar by 20% or $55,679.90 based upon lack of success, to obtain $222,719.60 and then increased that figure by 10% or $27,839.95 reckoning for the delay in payment, to reach a total fee for debtor's counsel of $250,559.55. That figure is apportioned between Fisher, Wayland and Mr. Bason so that the reductions imposed by the Court have been made against the law firm and not Mr. Bason. The amount awarded to the law firm is $161,266.50. Representation by two attorneys in this case was a luxury this debtor could ill afford.

**74**

With respect to the revised application filed by Schwarz and Greenblatt, the Court finds that the new application fails to properly indicate a lodestar analysis or the exercise of billing judgment. However, the amount of the fee appears to be reasonable under all of the circumstances in this case. In its earlier opinion, this Court posed the question of whether the fee to be awarded counsel to the creditors' committee should be reduced by a similar percentage as that which reduced the fees awarded to debtor's counsel. Upon further reflection, the Court has concluded that the considerations of duplication of effort and lack of success cannot be attributed to counsel to the creditors' committee. However, because the revised application failed to include a proper lodestar analysis, the amount of the fee to be awarded to Schwarz and Greenblatt will not be enhanced by any factor accounting for the delay in payment. Instead, the firm will be awarded the amount which it sought or $34,877.50 as total compensation.

Reimbursement of expenses will be awarded in the full amounts requested.